**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| ABX AIR, INC., ) | |
| 145 Hunter Drive ) | |
| Wilmington, OH 45177 ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO. _____ |
| v. ) | |
| ) | |
| INTERNATIONAL BROTHERHOOD OF ) | |
| TEAMSTERS, AIRLINE DIVISION; ) | |
| 25 Louisiana Ave NW, ) | |
| Washington, DC 20001 ) | |
| ) | |
| AIRLINE PROFESSIONALS ASSOCIATION ) | |
| OF THE INTERNATIONAL BROTHERHOOD ) | |
| OF TEAMSTERS, LOCAL UNION NO. 1224; ) | |
| 2754 Old State Route 73 ) | |
| Wilmington, OH 45177 ) | |
| ) | |
| Defendants. ) | |

---

**VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

---

Plaintiff ABX Air, Inc. ("ABX") brings this action for injunctive relief, declaratory relief,

and other appropriate relief under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, *et seq.*,

and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, against Defendants,

International Brotherhood of Teamsters ("IBT") and Airline Professionals Association of the

International Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224" or the "Union")

(collectively, "Defendants"), to enjoin them from continuing a strike that started, with no notice,

at about 230 am on November 22, 2016 and that has caused a virtually complete cessation of all

flight operations at ABX and, indeed, at other carriers who fly for the same customers.  This

caused the cancellation of 26 ABX flights and stranded over 1.25 million pounds of cargo for just one of ABX's primary customers.

## INTRODUCTION

1.     ABX seeks injunctive relief, declaratory relief, and other appropriate relief against Defendants for violations of Section 2, First of the RLA, Section 6, First of the RLA, and Section 204 of the RLA.

2.     As detailed below, Plaintiff and Defendants are currently engaged in bargaining under Section 6 of the RLA for a successor collective bargaining agreement.  In the parlance of the RLA, 45 U.S.C. §§ 151 *et seq.*, the parties are engaged in a so-called "major dispute."

3.     Under the RLA both parties are required to adhere to the status quo until the processes established by the RLA for the resolution of major disputes have been exhausted.

4.     Those processes are not exhausted until the National Mediation Board ("NMB"), the federal agency tasked with supervision of labor relations in the rail and air industries, finds the parties are at impasse, makes a proffer of interest arbitration that is not accepted by both parties, a 30-day cooling off period expires, and no Presidential Emergency Board is convened.

5.     The parties' negotiations are presently being conducted with the mediatory assistance of the NMB under Sections 5 and 6 of the RLA, 45 U.S.C. §§ 155, 156, and those major dispute resolution processes have not been exhausted.

6.     On October 27, 2016, there was pending between the parties minor disputes related to several issues, including vacation for upgrading captains, the process by which crewmembers who were junior assigned and received so-called "D6 Days" were able to obtain replacement days off, and schedule construction issues related to when and how often schedules were constructed to transition between day and night operations.  Correspondence from Union

attorney Lynne Nowel ("Nowel") dated October 27, 2016 describes the Union's position with respect to those issues.

7.     On October 31, 2016, ABX filed suit against Defendants because Defendants had threatened to engage in a strike.  During conferences with Judge Black, Defendants asserted that they had no intention of, or plans to, engage in a strike.  Indeed, in their memorandum in opposition to ABX's motion for a temporary restraining order, Defendants "categorically den[ied] that the Union ha[d] threatened a strike or that it intend[ed] to call one."  They further agreed to maintain the status quo.  Defendants have violated that commitment, and the Railway Labor Act, 45 U.S.C.§ 151 *et seq.*, by engaging in strike – a complete cessation of work – in support of those minor disputes that were pending when Defendants avowed they they did not intend to strike and would adhere to the status quo.

8.     The dispute brought here is different than the one brought in the October 31, 2016 complaint.  That complaint alleged that Defendants were violating the status quo by, among other things, requiring the ABX crewmembers to not bid for open flying and to not sell back vacation.  This complaint alleges that Defendants are engaged in a strike – a complete or virtually complete cessation of flying – in order to compel ABX to accede to Defendants demands associated with the minor disputes that were pending on October 27.

9.     One of the express purposes of the RLA is to "avoid any interruption to commerce or to the operation of any carrier engaged therein."  45 U.S.C. § 151a.  This principle is reflected in Section 2, First of the RLA (45 U.S.C. § 152, First) which imposes a duty on "all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to

<u>avoid any interruption to commerce or to the operation of any carrier</u> growing out of any dispute between the carrier and the employees thereof."  (Emphasis added.)

10.     The principle of avoiding interruptions to commerce in the airline industry is also reflected in the RLA's major dispute resolution process.  The major dispute procedures are "virtually endless" and "purposely long and drawn out."  *Burlington N. R.R. Co. v. Maint. of Way Employees*, 481 U.S. 429, 444 (1987); *Railway Clerks v. Florida E. Coast R.R. Co.*, 384 U.S. 238, 246 (1966).  A union may not engage in self-help or strike until those lengthy procedures have been exhausted.

11.     Similarly, a union is barred from striking over so-called minor disputes.

12.     ABX is responsible for shipping time-sensitive freight in interstate commerce on behalf of its two primary clients.  Beginning in early November of each year, ABX begins its peak season, relating to shipping during the Christmas holiday season.  Based on the timing of Defendants' actions, the Christmas shopping and shipping season have been and will continue to be severely impacted if flights full of freight for those customers continue to be cancelled because of Defendants' illegal labor actions, which will result in millions of dollars of freight and packages not timely being delivered to retailers and homes.

13.     Because Defendants' strike is directly at odds with the RLA, and because substantial and irreparable harm has been caused to, and will continue to be caused to, ABX and its customers if such an actions are permitted to continue, the Court should grant a temporary restraining order as requested by ABX.

## <u>JURISDICTION AND VENUE</u>

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case arises under the laws of the United States, specifically the RLA, 45 U.S.C. §§ 151, *et seq.*

Jurisdiction also is appropriate under 28 U.S.C. § 1337, as the RLA is a law regulating commerce.

15.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the suit occurred here.

## PARTIES

16.    ABX is a corporation organized and existing under the laws of the State of Delaware, with its principal offices in Wilmington, Ohio.

17.    ABX is a FAR Part 121 cargo airline flying express cargo routes for customers in the U.S. and around the world, making it a "common carrier by air engaged in interstate or foreign commerce" within the meaning of 45 U.S.C. § 181 and, therefore, subject to the RLA.

18.    ABX transports time-sensitive materials nationwide.  From its sort center in Wilmington, Ohio and DHL's sort center in Hebron, Kentucky, ABX services 43 cities in the United States and other countries with company-owned or leased aircraft.  ABX carries perishable goods for shipment that may be destroyed by even a short delay, and it ships hazardous materials that may pose safety risks if delivery is untimely.  It also carries essential goods critical to US commerce including company payrolls, computer parts critical to the operations of innumerable businesses, and documents essential to financial and real estate transactions and litigation.

19.    ABX has two primary customers.  One is DHL; approximately 20,742 block hours flown by ABX are flown pursuant to a contract between DHL, ABX, and ABX's affiliate, Cargo Aircraft Management, Inc.  For the other primary customer, approximately 6,580 block hours flown by ABX are flown pursuant to a contract between the customer, ABX, and ABX's affiliate, Airborne Global Solutions, Inc.

20. ABX's customers expect ABX to provide on-time, immediate delivery of their goods and materials; both have set a reliability standard in excess of 98%.

21. ABX is a wholly owned subsidiary of Air Transport Services Group, Inc. ("ATSG"), a publicly traded company (NASDAQ National Market).

22. Defendant IBT is an unincorporated labor organization headquartered in Washington, D.C. It is the collective bargaining representative of the ABX pilots under the RLA.

23. Defendant Local 1224 is an unincorporated labor organization headquartered in Wilmington, Ohio. It is a chartered affiliate of Defendant IBT, and as such, it provides labor representation services to pilots represented by IBT employed at numerous airlines throughout the United States. On information and belief, Local 1224 represents the pilots at all of the carriers who contract with DHL for service in the United States EXCEPT the pilots at Air Transport International ("ATI") who are represented by the Air Line Pilots Association, International ("ALPA"). On information and belief, IBT has delegated to Local 1224 the exclusive responsibility for providing day-to-day representation to the ABX pilots represented by IBT.

24. On information and belief, Defendant Local 1224 and Defendant IBT transact business within the jurisdiction of this Court.

## THE DISPUTE

### *The Parties' Collective Bargaining Agreement and Labor Negotiations*

25. ABX and IBT are parties to a collective bargaining agreement, which took effect in 2010. (the "Agreement" or "CBA"). A true and accurate copy of the CBA is attached hereto as **Exhibit A**.

6

26. Pursuant to Article 1, Section B of the Agreement, the Union and the pilots are to cooperate fully with ABX so as to attain efficient operations of the Company.

27. Pursuant to Article 25 of the Agreement (Duration), the parties exchanged Section 6 notices and began collective bargaining for a successor labor agreement in December 2013.

28. The parties have been in mediated negotiations under the auspices of the NMB, pursuant to Section 6 of the RLA, since August 2014 when Mediator James Mackenzie was appointed.

### Scheduling, Open Flying and Junior Manning Under the CBA

29. Under the Agreement, each of ABX's crewmembers has the opportunity to bid, each bid period (each of which equates, generally, to a month), for what is referred to as a "line of time." These "lines" are awarded in seniority order and represent the work schedules for the bid period for the crewmembers to whom they are awarded.

30. When these lines are constructed it is never possible to incorporate into them all of the known flying for any particular bid period. Also, flight assignments commonly drop out of crewmembers' lines because of training, vacation, leaves of absence, and other causes. The flight segments and trips (comprised of multiple flight segments) that are left over after the lines are constructed and awarded, along with the flight assignments that drop out of assigned lines, are referred to as "open flying."

31. Since at least implementation of the labor agreement between the parties in 1992, the primary method by which open flying has been distributed to crewmembers is through a seniority-based bid and award process. That remains true under the Agreement.

32. Also since at least implementation of the 1992 labor agreement, ABX's staffing model has depended upon crewmembers voluntarily bidding for open flying. ABX keeps no

crewmembers on staff solely to cover these open trips. When the Agreement and predecessor labor agreements were negotiated, both ABX and Local 1224 were aware that ABX depends upon crewmembers voluntarily bidding for open flying when deciding how many crewmembers it needs for each position in each aircraft type it operates. There is no other reasonable way in which to staff for the daily, weekly, and monthly variations in the volume of flying demanded by ABX's customers.

33.     There has been a pool of open flying every bid period since ABX started operating under its current general scheduling model more than two decades ago. Indeed, given the method by which lines of time necessarily are constructed, bid, and awarded, a certain volume of open flying is unavoidable.

34.     The Union bargained for the current general model for distribution of open flying in the parties' 1992 labor agreement. This model requires ABX to rely heavily on its crewmembers to bid for and fly the open flying trips. In exchange, crewmembers earn extra income when they perform open flying.

35.     If insufficient crewmembers bid for open flying, ABX may utilize an "emergency" process, known as "junior manning," (i.e. involuntary overtime) to assign pilots to the open flying lines.

36.     Under junior manning, pilots who can perform the flight without causing a delay are assigned open flights in order of reverse seniority.

37.     Pilots who are junior manned are given premium pay.

38.     If a pilot is junior manned on a scheduled day off more than six (6) times in a calendar year, ABX must provide that pilot with a replacement day off during the same or the following bid period to replace the day lost due to junior manning ("D6 Day").

39.    D6 Days were created with an understanding that pilots voluntarily bid on open flying, which makes resorting to junior manning the exception rather than the rule; D6 Days have been used under a long-standing past practice that pilots voluntarily bid on open flying.

40.    Junior manning and the consequent creation of D6 Days was never intended to be used to assign all, or even most, of the open flying during a bid period; one of the predicates to the Agreement is an understanding that, indeed, a significant portion of ABX's crewmembers will bid for open flying.  Traditionally, ABX operates with minimum need for junior manning because pilots willingly and voluntarily bid on open flying.

41.    When no crewmembers voluntarily bid for open flying, the predictable result is that ABX will have to junior man those flights.  Consequently, pilots will accumulate compounding D6 Days.  This process creates an operational "bottleneck" or "snowballing effect" in which ABX is unable to staff flights because of the accrued D6 Days.

42.    For example, when a pilot receives a D6 Day it results in a previously scheduled workday becoming a day off in the current bid month or, if there are insufficient work days in the current bid month, in the subsequent bid month.  A pilot can be junior manned on a previously scheduled workday that was turned into a day off by a D6 Day.

43.    Under the Agreement, a pilot can be junior assigned no earlier than five (5) days before the assignment.  The process of assigning trips through the junior assignment process is time consuming and has never been used at the volume currently being experienced.  As the volume of D6 Days expands (because pilots are not bidding on open flying), ABX's ability to properly complete the assignment process and to successfully contact pilots to give them junior man assignments, has been and will be impaired, and the Company has not and will not be able to successfully man flights.

44.     If ABX is unable to assign crewmembers to all the available open flying, or otherwise fill the necessary crew positions (*e.g.*, using management crewmembers), it will suffer a service failure that will alienate ABX's customers and those who have entrusted their documents, goods, and materials to ABX and its customers.

45.     During the 12 months preceding the May 2016 bid period, virtually all of the available open flying in any particular month was bid for by, and awarded to, crewmembers. ABX is staffed with the understanding that that practice will continue.  Thus, while any individual crewmember might decide to bid, or not to bid, for open flying in any particular month, ABX also must rely on the continuing practice and proposition that, if crewmembers are truly making independent decisions about performing open flying, it will always have sufficient crewmembers who will bid for it.

46.     In September 2016, only 0.013% of the available open flying was bid for and awarded to crewmembers.

47.     89.9% of ABX crewmembers are accumulating D6 Days through junior manning. 18.2% of ABX crewmembers have accumulated enough D6 Days through junior manning to have an entire bid period of days off.

48.     66% of ABX's current flight schedule for the month of November is designated as Open Flying because of the use of D6 Days to turn previously scheduled workdays into days off.  Because crewmembers are not bidding for open flying, virtually all of the trips on those days will have to be assigned through the laborious method of junior manning.  That includes flights operating on Thanksgiving and the surrounding days.

49.     ABX crewmembers are also not answering calls from scheduling, which they know will result in junior manning.

50.     Thus, the junior manning process is further complicated by crewmembers' concerted efforts to avoid calls from crew scheduling.

51.     In the past, when D6 days were not at the critical level they currently are at, and when crewmembers were answering calls from crew scheduling in order to be junior manned, ABX took contact from crewmembers at virtually any time more than 24 hours prior to the requested day off, and would confirm their day off request relatively promptly.

52.     The CBA does not specify when a crewmember can, or must, contact crew scheduling to identify his selected D6 Day, nor does it specify when the Company will respond to confirm that the day off is confirmed.  There has been, however, a consistent practice of two-way communications by which a crewmember identifies his selected D6 Day, and ABX confirms that selected day.

53.     Because crewmembers are avoiding – i.e., not answering – calls from crew scheduling that would result in receiving a junior man assignment ABX has elected to exercise the discretion given it by the CBA to alter the timing of communications regarding when crewmembers identify D6 Days, and when the Company responds confirming that the crewmember has received the identified day.

54.     On October 28, 2016, Ziebarth informed Boja that if ABX does not award the D6 Days like it has in the past the union "will shut them down" on November 1, 2016.  Later that day, an ABX captain informed ABX that Defendants had set a strike date of November 2, 2016.

55.     In response to that and other issues, ABX filed a lawsuit and sought a temporary restraining order.  During a conference call with Judge Black, Defendants denied such a threat or any intention to engage in a strike.

*The Minor Disputes Leading to Defendants' Unlawful Actions*

56.     Since at least October 27, 2016, there have been pending disputes between the parties related to (1) vacation for upgrading captains, (2) the process by which crewmembers who were junior assigned and received so-called "D6 Days" were able to obtain replacement days off, and (3) schedule construction issues related to when and how often schedules were constructed to transition between day and night operations.   Correspondence from Union attorney Lynne Nowel ("Nowel") dated October 28, 2016 describes the Union's position with respect to those issues.  A true and accurate copy of that letter is **Exhibit B hereto**.

57.     During meetings on November 18, 2016, ABX and Local 1224 met to discuss the issues raised in Nowel's letter.  ABX left those meetings believing that all the issues raised had been resolved to everyone's satisfaction, or that the parties were on their way to a mutually acceptable resolution for all the issues, except for when crewmembers should request their days off created by the D6 Day (i.e., a replacement day off), and when ABX would respond to that request.

58.     On November 19, 2016, ABX Vice President of Flight Operations Robert Boja ("Boja") received a call from Local 1224 Executive Committee Chairman Richard Ziebarth ("Ziebarth").  During this call it became apparent to Boja that Ziebarth – who had declined to attend the November 18 meeting – was misinformed or misunderstood the results of that meeting.  He sent a letter to Ziebarth the next day explaining the Company's view of where the parties stood and what disputes remained.  A true and accurate copy of Boja's letter is attached hereto as **Exhibit C**.

59.     With respect to vacations for upgrading captains, ABX acceded to IBT's position, despite believing that it had a viable contractual basis for its position, and assured IBT that it

would make available the requisite number of vacation weeks for which the upgrading captains could bid based on their seniority, as IBT demanded. That process was underway on November 21, 2016.

60. With respect to the day/night transition issue that Nowel claimed was a status quo violation, during the meeting on November 18 one of IBT's representatives who is on the Union's Scheduling Committee (John Niewenhous ("Niewenhous")), conceded that the lines of time that the pilots were flying were (with one exception) legally constructed. Indeed, during a scheduling committee meeting earlier in the year the Union's Scheduling Committee ("USC") discussed with Company representatives a plan to make trips that were otherwise in conflict with the CBA's day/night transition requirements contractually compliant by adding assignments – referred to in the CBA as "R4" assignments – to the trips. With the exception discussed below, there was not then, and has not been since then, a claim by the USC that trips build with R4s violate the CBA's day/night construction requirements. During the meeting on November 18 none of the Defendant's representative were able to identify any trip – other than one – that was not compliant with the CBA.

61. There is one series of flights to and from Rockford ("RFD") that were recently assigned to ABX for which the addition of an R4 assignment would not make the trip compliant with the CBA's day/night transition requirements; but the USC has also not made any formal objection to that trip. During the meeting on November 18, and again in the correspondence that Boja sent to Ziebarth on November 20, ABX informed the Union that if acceptable terms to keep that flying could not be agreed upon then ABX would inform its customer that it could no longer perform that flying. ABX committed that, if no such agreement could be reached, that flying would be eliminated by or before December 1. When the meeting ended on November 18 – all

of the Union's representatives had left by 5 pm because they reportedly had planes to catch – ABX had an offer on the table that conformed in most respects to an offer that IBT previously had made that would waive the day/night transition issue and eliminate the need to add the R4 assignments to the trips.

62.     With respect to the D6 Days, IBT demanded that ABX rescind Flight Crew Letter 16-85, which ABX agreed to do on November 18.  It was withdrawn on November 20. In the replacement flight crew letter, ABX committed to granting the D6 Day (the replacement day off) of every crewmember who requested one.  A true and accurate copy of the November 21, 2016 replacement flight crew letter is **Exhibit D** hereto.

63.     The only remaining issues with respect to D6 Days relate to: (1) when a crewmember requests his day off, and when the Company responds to the crewmember's notification, and (2) a new and patently false assertion that a crewmember cannot be junior assigned on the replacement day (Article 13.M.5. of the CBA expressly states that the replacement days off are not "inviolate" days; which in airline CBA parlance specifically means that it is a day on which a crewmember can be junior manned).

64.     The Union's contention is that a crewmember can request his replacement day off at any time until 24 hours prior to the start of the requested replacement day off, and that the Company must respond "upon receipt" of the crewmember's notification.  The Union further contends these rights and obligations arise from a so-called "past practice."

65.     ABX disagrees with the Union's position.  It is true that there has been a period of time during which those were – as a chronological matter – the processes that were used, but they were used only because the CBA left solely to ABX authority to decide when those communications would occur.  The "past practice" is not a matter of when these communication

occur; rather, the binding past practice is that the CBA vests ABX with discretion to decide when the communications will occur. ABX has in the past, and presently does, conform to that past practice.

66.     Even if there were a "past practice" as the Union contends, whether there is "binding past practice," and if it continues to be binding in the face of altered circumstances – the vast volume of D6 Days and crewmembers' avoidance of calls from crew scheduling – constitute a minor dispute outside the Court's jurisdiction; and the RLA unambiguously bars Defendants from striking over minor disputes.

67.     Despite their legal obligation to adhere to the status quo, Defendants are engaged in an unlawful campaign to exert economic pressure on ABX through various concerted efforts in order to coerce ABX to accede to their demands regarding the minor disputes described above.

68.     Defendants actions caused, in the early morning hours of November 22, 2016, the cancellation of 26 flights for four customers carrying approximately 1.25 million pounds of cargo.

69.     Should Defendants continue these unlawful actions ABX and its customers will continue to be significantly harmed. Defendants' concerted actions will continue to cost ABX millions of dollars. Beyond that, Defendants' unlawful strike will continue to interrupt interstate commerce.

### *The Irreparable Injury to ABX, Its Customers, and the Public by Defendants' Unlawful Job Actions*

70.     ABX will suffer irreparable injury in the absence of injunctive relief. Even a one-day strike has cost the company untold lost revenue and resulted in twenty- six (26) cancelled flights and the stranding of over 1.25 million pounds of freight for DHL, and additional freight for the other primary customer. This strike has damage ABX's goodwill with all its customers.

71.     Unless the Court enjoins this strike and requires Local 1224 to take strong affirmative action requiring its constituency to return to work, more flights will be canceled and interstate commerce will continue to be interrupted.

72.     Defendants' actions have caused imminent and irreparable harm to ABX, ABX's customers, and the millions of individuals who rely on ABX's customers to deliver on time during the Christmas holiday season.

73.     Defendants also represent the crewmembers employed by Atlas Air, Inc.; Southern Air, Inc., and Kalitta Air.  When Defendants struck ABX's operations they also strike those carriers' operations, thus magnifying the consequences of the strike for the customers and its impact on interstate commerce.

74.     ABX is in a fiercely competitive business and can ill afford to upset or lose any customers.  As a direct result of the strike ABX's reputation as a reliable carrier, and its relations with its customers, are put in jeopardy, as are jobs of ABX's union and nonunion employees.

### *ABX's Effort to Resolve this Dispute without Judicial Intervention*

75.     As described above, representatives of ABX met with respresentatives from IBT on November 18 and believed that all the issues had been resolved, except the timing of the D6 communications, and ABX's right to junior assign on a D6 Day, which were clearly minor disputes.

76.     ABX continues to be willing to negotiate with Local 1224; however, Defendants' are unwilling to negotiate unless ABX simply accedes to its demands.

77.     No money judgment against Defendants could adequately compensate ABX for the financial and operational turmoil and damage to its reputation, caused by Defendants'

unlawsul strike.  ABX has no adequate remedy at law, as the harm caused to ABX is irreversible, incalculable, and otherwise irreparable.

78.     ABX has satisfied all of its legal obligations in connection with this dispute. ABX has complied with every obligation imposed by law which is involved in the labor dispute in question and has made every reasonable effort to resolve the dispute.

### COUNT I
### VIOLATION OF SECTION 2, FIRST OF THE  RAILWAY LABOR ACT

79.     The allegations of paragraphs 1 through 78 are incorporated by reference.

80.     Section 2, First of the Railway Labor Act, 45 U.S.C. § 152, First, requires air carriers and labor organizations representing their employees to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such contracts or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

81.     Defendants have violated their mandatory duty to exert every reasonable effort to resolve its major disputes with ABX.  There is no question that the ongoing strike is being directed and sponsored by the Defendants and that, unless enjoined, the Defendants continue this unlawful strike.

### COUNT II
### VIOLATION OF SECTION 6 OF THE RAILWAY LABOR ACT

82.     The allegations of paragraphs 1 through 81 are incorporated by reference.

83.     Section 6 of the RLA, 45 U.S.C. § 156, requires parties engaged in direct Section 6 negotiations for a revised collective bargaining agreement (*i.e.*, negotiations prior to the involvement of the NMB) to maintain the status quo.  For represented employees, this means that

they are forbidden from engaging in strikes or self-help intended to interfere with or disrupt their employer's operations.  For the union that represents those employees, that status quo obligation means that it is forbidden from taking any action to cause, encourage, coordinate, or facilitate unlawful self-help by those employees, including participating in a strike.  It also means that the union has an affirmative obligation – regardless of whether it is in any way responsible for the employees undertaking unlawful actions – to take all reasonable measures to prevent those employees' unlawful self-help from commencing and to stop it if it has begun.  Defendants, herein, have complied with none of those legal obligations in connection with the on-going strike and thus have violated Section 6 of the RLA.

84.　　As to each item of relief sought herein, greater injury will be inflicted upon ABX and the public if such relief is denied than will be inflicted upon Defendants by the granting thereof.  Defendants will suffer no injury if an injunction is issued, inasmuch as they merely will be required to comply with the law.

85.　　The injunction also would foster the public interest, as it would prevent a significant interruption to ABX's operations and interstate commerce, a primary goal of the RLA.

### COUNT III
### VIOLATION OF 45 U.S.C SECTION 184
### (ILLEGAL SELF HELP IN AID OF A MINOR DISPUTE)

86.　　The allegations of paragraphs 1 through 85 are incorporated by reference.

87.　　Defendants' strike is intended to compel ABX to to accede to its demands related to minor disputes, and thus seeks to circumvent the mandatory grievance and system board procedures required by the CBA and by Section 204 of the RLA, 45 U.S.C. Section 184.

88.    Defendants and it members' actions constitute an illegal strike in aid of Defendants' position in aid of a minor dispute, in derogation of their duties to resolve the dispute through arbitration as mandated by the RLA.

## RELIEF REQUESTED

WHEREFORE, Plaintiff ABX requests that this court provide the following relief:

(1)    Issue a temporary restraining order, a preliminary injunction, and a permanent injunction:

(a)    restoring the status quo and restraining and enjoining IBT, Local 1224, and Local 1224's officers, members, and representatives and all persons acting by, in concert with, through, or under them and each of them, or by and through their orders, and all others acting or participating with them from calling for, permitting, instigating, authorizing, encouraging, participating in, approving of, commencing, or continuing, in connection with the parties' Section 6 negotiations or any other major or minor dispute contemplated by the Railway Labor Act, any disruption, curtailment, or restriction of normal airline operations, including but not limited to strikes, concerted refusals to fly, concerted refusals to bid on open flying, or other work stoppages, and all acts in furtherance or in support thereof; and,

(b)    directing Local 1224 and said persons to take all steps in their power to prevent said disruption of normal airline operations from commencing or from continuing if commenced, including sending a letter to all crewmembers stating that Local 1224 has violated the Railway Labor Act

by encouraging ABX crewmembers to strike, and directing the

crewmembers to refrain from or cease all such activities immediately.

(2)     Issue a declaratory judgment that Local 1224's actions complained of herein, and

its crewmember constituents' strike, and any other economic action undertaken by them

against ABX, without compliance with the procedures required by the Railway Labor

Act, constitutes joint and individual violations of Sections 2, First, 6, and 204 of the

Railway Labor Act, 45 U.S.C. §§ 152, First; 156; and 184.

(3)     Issue an Order providing the following additional relief:

(a)     Defendants provide a copy of this Court's Order by certified mail to every

ABX crewmember at their most current address of record, in order to

ameliorate the effects of Defendants' unlawful conduct under the RLA.

(4)     To the extent Defendants' actions constitute a dispute over the interpretation

and/or application of Article 13.M., or any other provision of the Agreement, Defendants

shall be ordered to mandatory arbitration with the status quo returned throughout the

pendency of that arbitration.

(5)     Award damages against Defendants in such amount as may be proven at trial,

together with such other relief as this Court may deem proper, including costs and

attorneys' fees.

Dated:  November 22, 2016

Respectfully submitted,

TRIAL ATTORNEY

*/s/  Daniel J. Buckley*
Daniel J. Buckley
Ohio Bar No. Bar No. 0003772

Vorys Sater Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45202
Telephone:     (513) 723-4002
Facsimile:     (513) 852-7865
E-mail djbuckley@vorys.com

Andrew D. McClintock *(Pro Hac Vice forthcoming)*
Patricia G. Griffith *(Pro Hac Vice forthcoming)*
FORD & HARRISON, LLP
271 17th Street NW, Ste. 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3830
Facsimile: (404) 888-3863
Email:  amcclintock@fordharrison.com

Dannie B. Fogleman (*Pro Hac Vice forthcoming*)
FORD & HARRISON, LLP
1300 19th Street, NW, Suite 300
Washington, DC 20036
Telephone:     (202) 719-2014
Facsimile:     (202) 719-2077

**Attorneys for Plaintiff**
**ABX Air Inc.**

## VERIFICATION OF COMPLAINT

I, *Robert Boja* declare that I am the Vice President of Flight Operations for ABX Air,

Inc., and that I am authorized to make this verification on its behalf. I have read the foregoing

Verified Complaint for Injunctive and Declaratory Relief, and I know the facts stated therein to

be true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Robert N. Boja

Sworn and Subscribed to:
before me this 22 day of November, 2016.

_____
Notary Public

My commission expires: 2/28/21

VICKI J ERTEL
Notary Public
State of Ohio
My Commission Expires
February 28, 2021

22

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 22, 2016, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.  A courtesy copy has been served on the following parties via email:

> John Robert Doll
> Doll, Jansen & Ford
> 111 West First Street, Suite 1100
> Dayton, OH 45402-1156
> Telephone: 937-461-5310
> Fax:  937-461-7219
> Email:  jdoll@djflawfirm.com
>
> Lynne Nowel
> Airline Professionals Assoc. Teamsters Local 1224
> 2754 Old State Route 73
> Wilmington, OH 45177
> Telephone: 937-655-9585
> Fax: 937-383-0902
> Email:  lnowel@apa1224.org
>
> Ed Gleason, Esq.
> The Law Office of Edward Gleason
> 910 17th St. N.W., Suite 800
> Washington, D.C. 20006
> Telephone:  703-608-7880
> Email:  egleason@gleasonlawdc.com

s/ *Daniel J. Buckley*
Daniel J. Buckley
