**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| ABX AIR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 1:16-cv-01096 |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS, AIRLINE DIVISION; AIRLINE | ) | |
| PROFESSIONALS ASSOCIATION OF THE | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS, LOCAL UNION NO. 1224, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff ABX Air, Inc. ("ABX") submits this Motion for Temporary Restraining Order pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, *et seq.*, and Fed. R. Civ. P. 65, to prohibit Defendants, International Brotherhood of Teamsters ("IBT") and Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224") (collectively, "Defendants"), from engaging in unlawful self-help.

As fully detailed in the accompanying Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order, ABX and IBT are parties to a collective bargaining agreement ("CBA"). In order to compel ABX to accede to Defendants' positions with respect to pending "minor disputes" (i.e., grievances subject to the CBA's grievance and arbitration procedures) Defendants orchestrated a work stoppage that started at approximately 230 am on November 22 and is ongoing. This work stoppage has interrupted interstate commerce by causing the cancellation of 26 ABX flights and the stranding of approximately 1.25 million pounds of cargo for one ABX customer, and even more for other customers, and through sympathetic action the cancellation of flights and the stranding of cargo of other carriers who fly for the same customers

as ABX.  ABX respectfully requests that this Court hear the matter on an expedited basis and

issue a temporary restraining order.

Respectfully submitted,

TRIAL ATTORNEY

*/s/  Daniel J. Buckley*
Daniel J. Buckley
Ohio Bar No. Bar No. 0003772
Vorys Sater Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45202
Telephone:     (513) 723-4002
Facsimile:     (513) 852-7865
E-mail djbuckley@vorys.com

Andrew D. McClintock *(Pro Hac Vice forthcoming)*
Patricia G. Griffith *(Pro Hac Vice forthcoming)*
FORD & HARRISON, LLP
271 17th Street NW, Ste. 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3830
Facsimile: (404) 888-3863
Email:  amcclintock@fordharrison.com

Dannie B. Fogleman (*Pro Hac Vice forthcoming*)
FORD & HARRISON, LLP
1300 19th Street, NW, Suite 300
Washington, DC 20036
Telephone:     (202) 719-2014
Facsimile:     (202) 719-2077

**Attorneys for Plaintiff**
**ABX Air Inc.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| ABX AIR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 1:16-cv-01096 |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS, AIRLINE DIVISION; AIRLINE | ) | |
| PROFESSIONALS ASSOCIATION OF THE | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | |
| TEAMSTERS, LOCAL UNION NO. 1224, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER

Plaintiff ABX Air, Inc. ("ABX") files its Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order.

## I.  INTRODUCTION

ABX brings this suit, and this motion for a temporary restraining order ("TRO") to enjoin Defendants International Brotherhood of Teamsters ("IBT") and IBT, Local Union No. 1224 ("Local 1224" or the "Union"), (collectively referred to as "Defendants"), from continuing an ongoing and patently illegal strike in support of so-called "minor disputes" that Defendants are required to resolve through arbitration rather than self-help.  Defendants instituted the strike without notice at about 2:30 a.m. on November 22, 2016, and have caused the cancellation of 26 ABX flights and the stranding of approximately 1.25 million pounds of freight for one customer alone, and additional freight consigned to ABX by other customers – as well as flights and cargo of other carriers who fly for the same customers as a result of sympathetic action.

1

ABX is a "carrier by air" as defined by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, *et seq.*. ABX transports time-sensitive materials nationwide. It has two primary customers. All of ABX's customers expect ABX to provide on-time, immediate delivery of their goods and materials.

As we show herein, ABX is entitled to a temporary restraining order to stop Defendants' unlawful actions.

## II.  STATEMENT OF FACTS

### a.  The Parties

ABX is a corporation organized and existing under the laws of the State of Delaware, with its principal offices in Wilmington, Ohio. It is a FAR Part 121 cargo airline flying express cargo routes for customers in the U.S. and around the world, making it a "common carrier by air engaged in interstate or foreign commerce" within the meaning of 45 U.S.C. § 181 and, therefore, subject to the RLA.

ABX transports time-sensitive materials nationwide. From its sort center in Wilmington, Ohio and DHL's sort center in Hebron, Kentucky, ABX services 43 cities in the United States and other countries with company-owned or leased aircraft. ABX carries perishable goods for shipment that may be destroyed by even a short delay, and it ships hazardous materials that may pose safety risks if delivery is untimely. It also carries company payrolls, computer parts critical to the operations of innumerable businesses, and documents essential to financial and real estate transactions and litigation.

ABX has two primary customers. One is DHL; approximately 20,742 block hours flown by ABX are flown pursuant to a contract between DHL, ABX, and ABX's affiliate, Cargo Aircraft Management, Inc. For the other primary customer, approximately 6,580 block hours

flown by ABX are flown pursuant to a contract between the customer, ABX, and ABX's affiliate, Airborne Global Solutions, Inc. ABX's customers expect ABX to provide on-time, immediate delivery of their goods and materials; both have set a reliability standard in excess of 98%.

Defendant IBT is an unincorporated labor organization headquartered in Washington, D.C. It is the collective bargaining representative of the ABX pilots under the RLA. Defendant Local 1224 is an unincorporated labor organization headquartered in Wilmington, Ohio. It is a chartered affiliate of Defendant IBT, and as such, it provides labor representation services to pilots represented by IBT employed at numerous airlines throughout the United States. Local 1224 represents the pilots at all of the carriers who contract with DHL for service in the United States EXCEPT the pilots at Air Transport International ("ATI") who are represented by the Air Line Pilots Association, International ("ALPA"). IBT has delegated to Local 1224 the exclusive responsibility for providing day-to-day representation to the ABX pilots represented by IBT.

ABX and IBT are parties to a collective bargaining agreement, which took effect in 2010. (the "Agreement" or "CBA"). A true and accurate copy of the CBA is attached to Plaintiff's Verified Complaint as **Exhibit A**. Pursuant to Article 1, Section B of the Agreement, the Union and the pilots are to cooperate fully with ABX so as to attain efficient operations of the Company.

Pursuant to Article 25 of the Agreement (Duration), the parties exchanged Section 6 notices and began collective bargaining for a successor labor agreement in December 2013. The parties have been in mediated negotiations under the auspices of the NMB, pursuant to Section 6 of the RLA, since August 2014 when Mediator James Mackenzie was appointed.

### b. The Parties' Minor Disputes

### i. Scheduling, Open Flying and Junior Manning Under the CBA

Under the Agreement, each of ABX's crewmembers has the opportunity to bid, each bid period (each of which equates, generally, to a month), for what is referred to as a "line of time." These "lines" are awarded in seniority order and represent the work schedules for the bid period for the crewmembers to whom they are awarded. When these lines are constructed it is never possible to incorporate into them all of the known flying for any particular bid period. Also, flight assignments commonly drop out of crewmembers' lines because of training, vacation, leaves of absence, and other causes. The flight segments and trips (comprised of multiple flight segments) that are left over after the lines are constructed and awarded, along with the flight assignments that drop out of assigned lines, are referred to as "open flying."

Since at least implementation of the labor agreement between the parties in 1992, the primary method by which open flying has been distributed to crewmembers is through a seniority-based bid and award process. That remains true under the Agreement. Also since at least implementation of the 1992 labor agreement, ABX's staffing model has depended upon crewmembers voluntarily bidding for open flying. ABX keeps no crewmembers on staff solely to cover these open trips. When the Agreement and predecessor labor agreements were negotiated, both ABX and Local 1224 were aware that ABX depends upon crewmembers voluntarily bidding for open flying when deciding how many crewmembers it needs for each position in each aircraft type it operates. There is no other reasonable way in which to staff for the daily, weekly, and monthly variations in the volume of flying demanded by ABX's customers.

There has been a pool of open flying every bid period since ABX started operating under its current general scheduling model more than two decades ago. Indeed, given the method by which lines of time necessarily are constructed, bid, and awarded, a certain volume of open flying is unavoidable. The Union bargained for the current general model for distribution of open flying in the parties' 1992 labor agreement. This model requires ABX to rely heavily on its crewmembers to bid for and fly the open flying trips. In exchange, crewmembers earn extra income when they perform open flying. If insufficient crewmembers bid for open flying, ABX may utilize an "emergency" process, known as "junior manning," (i.e. involuntary overtime) to assign pilots to the open flying lines. Under junior manning, pilots who can perform the flight without causing a delay are assigned open flights in order of reverse seniority. Pilots who are junior manned are given premium pay.

If a pilot is junior manned on a scheduled day off more than six (6) times in a calendar year, ABX must provide that pilot with a replacement day off during the same or the following bid period to replace the day lost due to junior manning ("D6 Day"). D6 Days were created with an understanding that pilots voluntarily bid on open flying, which makes resorting to junior manning the exception rather than the rule; D6 Days have been used under a long-standing past practice that pilots voluntarily bid on open flying. Junior manning and the consequent creation of D6 Days was never intended to be used to assign all, or even most, of the open flying during a bid period; one of the predicates to the Agreement is an understanding that, indeed, a significant portion of ABX's crewmembers will bid for open flying. Traditionally, ABX operates with minimum need for junior manning because pilots willingly and voluntarily bid on open flying.

When no crewmembers voluntarily bid for open flying, the predictable result is that ABX will have to junior man those flights. Consequently, pilots will accumulate compounding D6

Days.  This process creates an operational "bottleneck" or "snowballing effect" in which ABX is unable to staff flights because of the accrued D6 Days.  For example, when a pilot receives a D6 Day it results in a previously scheduled workday becoming a day off in the current bid month or, if there are insufficient work days in the current bid month, in the subsequent bid month.  A pilot can be junior manned on a previously scheduled workday that was turned into a day off by a D6 Day.

Under the Agreement, a pilot can be junior assigned no earlier than five (5) days before the assignment.  The process of assigning trips through the junior assignment process is time consuming and has never been used at the volume currently being experienced.  As the volume of D6 Days expands (because pilots are not bidding on open flying), ABX's ability to properly complete the assignment process and to successfully contact pilots to give them junior man assignments, has been and will be impaired, and the Company has not and will not be able to successfully man flights.  If ABX is unable to assign crewmembers to all the available open flying, or otherwise fill the necessary crew positions (*e.g.*, using management crewmembers), it will suffer a service failure that will alienate ABX's customers and those who have entrusted their documents, goods, and materials to ABX and its customers.

During the 12 months preceding the May 2016 bid period, virtually all of the available open flying in any particular month was bid for by, and awarded to, crewmembers.  ABX is staffed with the understanding that that practice will continue.  Thus, while any individual crewmember might decide to bid, or not to bid, for open flying in any particular month, ABX also must rely on the continuing practice and proposition that, if crewmembers are truly making independent decisions about performing open flying, it will always have sufficient crewmembers

who will bid for it. In September 2016, only 0.013% of the available open flying was bid for and awarded to crewmembers.

89.9% of ABX crewmembers are accumulating D6 Days through junior manning. 18.2% of ABX crewmembers have accumulated enough D6 Days through junior manning to have an entire bid period of days off. 66% of ABX's current flight schedule for the month of November is designated as Open Flying because of the use of D6 Days to turn previously scheduled workdays into days off. Because crewmembers are not bidding for open flying, virtually all of the trips on those days will have to be assigned through the laborious method of junior manning. That includes flights operating on Thanksgiving and the surrounding days.

ABX crewmembers are also not answering calls from scheduling, which they know will result in junior manning. Thus, the junior manning process is further complicated by crewmembers' concerted efforts to avoid calls from crew scheduling.

In the past, when D6 days were not at the critical level they currently are at, and when crewmembers were answering calls from crew scheduling in order to be junior manned, ABX took contact from crewmembers at virtually any time more than 24 hours prior to the requested day off, and would confirm their day off request relatively promptly.

The CBA does not specify when a crewmember can, or must, contact crew scheduling to identify his selected D6 Day, nor does it specify when the Company will respond to confirm that the day off is confirmed. There has been, however, a consistent practice of two-way communications by which a crewmember identifies his selected D6 Day, and ABX confirms that selected day. Because crewmembers are avoiding – i.e., not answering – calls from crew scheduling that would result in receiving a junior man assignment ABX has elected to exercise the discretion given it by the CBA to alter then timing of communications regarding when

crewmembers identify D6 Days, and when the Company responds confirming that the crewmember has received the identified day.

On October 28, 2016, Ziebarth informed Boja that if ABX does not award the D6 Days like it has in the past the union "will shut them down" on November 1, 2016. Later that day, an ABX captain informed ABX that Defendants had set a strike date of November 2, 2016.

In response to that and other issues, ABX filed a lawsuit and sought a temporary restraining order. During a conference call with Judge Black, Defendants denied such a threat or any intention to engage in a strike. Indeed, they committed to refrain from self help.

## ii.  The Parties' Minor Disputes Lead to the Strike

Since at least October 27, 2016, there have been pending disputes between the parties related to (1) vacation for upgrading captains, (2) the process by which crewmembers who were junior assigned and received so-called "D6 Days" were able to obtain replacement days off, and (3) schedule construction issues related to when and how often schedules were constructed to transition between day and night operations. Correspondence from Union attorney Lynne Nowel ("Nowel") dated October 28, 2016 describes the Union's position with respect to those issues. A true and accurate copy of that letter is attached to Plaintiff's Verified Complaint as **Exhibit B**.

During meetings on November 18, 2016, ABX and Local 1224 met to discuss the issues raised in Nowel's letter. ABX left those meetings believing that all the issues raised had been resolved to everyone's satisfaction, or that the parties were on their way to a mutually acceptable resolution for all the issues, except for when crewmembers should request their days off created by the D6 Day (i.e., a replacement day off), and when ABX would respond to that request.

On November 19, 2016, ABX Vice President of Flight Operations Robert Boja ("Boja") received a call from Local 1224 Executive Committee Chairman Richard Ziebarth ("Ziebarth").

During this call it became apparent to Boja that Ziebarth – who had declined to attend the November 18 meeting – was misinformed or misunderstood the results of that meeting. He sent a letter to Ziebarth the next day explaining the Company's view of where the parties stood and what disputes remained. A true and accurate copy of Boja's letter is attached to Plaintiffs' Verified Complaint as **Exhibit C**.

With respect to vacations for upgrading captains, ABX acceded to IBT's position, despite believing that it had a viable contractual basis for its position, and assured IBT that it would make available the requisite number of vacation weeks for which the upgrading captains could bid based on their seniority, as IBT demanded. That process was underway on November 21, 2016.

With respect to the day/night transition issue that Nowel claimed was a status quo violation, during the meeting on November 18 one of IBT's representatives who is on the Union's Scheduling Committee (David Niewenhous ("Niewenhous")), conceded that the lines of time that the pilots were flying were (with one exception) legally constructed. Indeed, during a scheduling committee meeting earlier in the year the Union's Scheduling Committee ("USC") discussed with Company representatives a plan to make trips that were otherwise in conflict with the CBA's day/night transition requirements contractually compliant by adding assignments – referred to in the CBA as "R4" assignments – to the trips. With the exception discussed below, there was not then, and has not been since then, a claim by the USC that trips build with R4s violate the CBA's day/night construction requirements. During the meeting on November 18 none of the Defendant's representative were able to identify any trip – other than one – that was not compliant with the CBA.

There is one series of flights to and from Rockford ("RFD") that were recently assigned to ABX for which the addition of an R4 assignment would not make the trip compliant with the CBA's day/night transition requirements; but the USC has also not made any formal objection to that trip. During the meeting on November 18, and again in the correspondence that Boja sent to Ziebarth on November 20, ABX informed the the Union that if acceptable terms to keep that flying could not be agreed upon then ABX would inform its customer that it could no longer perform that flying. ABX committed that, if no such agreement could be reached, that flying would be eliminated by or before December 1. When the meeting ended on November 18 – all of the Union's representatives had left by 5 pm because they reportedly had planes to catch – ABX had an offer on the table that conformed in most respects to an offer that IBT previously had made that would waive the day/night transition issue and eliminate the need to add the R4 assignments to the trips.

With respect to the D6 Days, IBT demanded that ABX rescind Flight Crew Letter 16-85, which ABX agreed to do on November 18. It was withdrawn on November 20. In the replacement flight crew letter, ABX committed to granting the D6 Day (the replacement day off) of every crewmember who requested one. A true and accurate copy of the November 20, 2016 replacement flight crew letter is attached to Plaintiff's Verified Complaint as **Exhibit D**.

The only remaining issues with respect to D6 Days relate to: (1) when a crewmember requests his day off, and when the Company responds to the crewmember's notification, and (2) a new and patently false assertion that a crewmember cannot be junior assigned on the replacement day (Article 13.M.5. of the the CBA expressly states that the replacement days off are not "inviolate" days; which in airline CBA parlance specifically means that it is a day on which a crewmember can be junior manned).

The Union's contention is that a crewmember can request his replacement day off at any time until 24 hours prior to the start of the requested replacement day off, and that the Company must respond "upon receipt" of the crewmember's notification. The Union further contends these rights and obligations arise from a so-called "past practice."

ABX disagrees with the Union's position. It is true that there has been a period of time during which those were – as a chronological matter – the processes that were used, but they were used only because the CBA left solely to ABX authority to decide when those communications would occur. The "past practice" is not a matter of when these communication occur; rather, the binding past practice is that the CBA vests ABX with discretion to decide when the communications will occur. ABX has in the past, and presently does, conform to that past practice.

Even if there were a "past practice" as the Union contends, whether there is "binding past practice," and if it continues to be binding in the face of altered circumstances – the vast volume of D6 Days and crewmembers' avoidance of calls from crew scheduling – constitute a minor dispute outside the Court's jurisdiction; and the RLA unambiguously bars Defendants from striking over minor disputes.

Despite their legal obligation to adhere to the status quo, Defendants are engaged in an unlawful campaign to exert economic pressure on ABX through various concerted efforts in order to coerce ABX to accede to their demands regarding the minor disputes described above.

### c. **Defendants Have Caused Irreparable Harm to ABX**

Defendants implemented their strike at about 230 am on November 22, 2016. Defendants actions caused the cancellation of 26 flights for four customers carrying approximately 1.25 million pounds of cargo for DHL alone, and additional freight for ABX's other customers. Defendants' strike will, if not enjoined, continue to cost ABX millions of dollars, cause irreparable harm to ABX's reputation, and deeply damage and interrupt interstate commerce.

## III.  ARGUMENT AND CITATION TO AUTHORITY

### a. **Plaintiff ABX Is Entitled to Injunctive Relief Because Defendants Are Striking In Support of Minor Disputes**.

One of the primary purposes of the RLA, as stated in the statute itself, is "[t]o avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152, First. See also Airline Professionals Ass'n, Teamster Local Union 1224 v. ABX Air, Inc., 400 F.3d 411, 413 (6th Cir. 2005) ("ABX II"). In order to facilitate that goal, Section 2 First of the RLA, 45 U.S.C. § 152 First, the "heart" of the statute, requires that all air and rail carriers and their employees "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes . . . ." See Brotherhood of R.R. Trainmen v. Jacksonville Terminal, 394 U.S. 369, 377-78 (1969).

To achieve that goal Congress established distinct mechanisms for the resolution of disputes between carriers and the unions that represent their employees, and status quo

obligations attendant to each.[1]  The RLA thus provides two primary mandatory procedures for resolving disputes between carriers and unions. For purposes of determining which of the RLA's procedures are to be followed in resolving labor disputes, the courts have classified those disputes as either "major" or "minor." See Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 723, 65 S. Ct. 1282, 1290 (1945).  Whether the dispute is classified as "major" or "minor" relates not to the importance of the dispute, but its source. ABX II, 400 F.3d at 414; Airline Professionals Ass'n, of the Int'l Bhd. of Teamsters, Local Union 1224 v. ABX Air, Inc., 274 F.3d 1023, 1027 (6th Cir. 2001) ("ABX I").

"Major" disputes arise from the negotiation or re-negotiation of collective bargaining agreements.  Burley, 325 U.S. at 723.  Major commence when either or both parties serve timely notice, called a "Section 6 Notice," of an intent to bargain.  45 U.S.C. §156; see Jacksonville Terminal, 394 U.S. at 378.[2]  Thereafter, the RLA establishes an "almost interminable" process of negotiation, mediation, voluntary arbitration and conciliation.  See Detroit & Toledo Shore Line R. R. v. United Transp. Union, 396 U.S. 142, 149, 90 S. Ct. 294, 299 (1969) ("Shoreline").

---

[1] This is far from the first time the IBT has been unable to identify minor disputes. This Court has already corrected Defendants numerous times. See Airline Professionals Ass'n, of the Int'l Bhd. of Teamsters, Local Union 1224 v. ABX Air, Inc., Case No. 1-99-073 (S.D. Ohio July 31, 2000) (decision to institute random searches of pilots was a minor dispute), aff'd, 274 F.3d 1023 (6th Cir. 2001); Airline Professionals Ass'n, of the Int'l Bhd. of Teamsters, Local Union 1224 v. ABX Air, Inc., Case C-1-99-609 (S.D. Ohio Aug. 21, 2000) (change in policy regarding cockpit voice recorders was a minor dispute), aff'd, 2001 U.S. App. LEXIS 26911 (6th Cir. 2001), Airline Professionals Ass'n, of the Int'l Bhd. of Teamsters, Local Union 1224 v. ABX Air, Inc., C-1-01-775 (S.D. Ohio Apr. 10, 2003) (letter to pilots instructing them not to talk to the press was a minor dispute), aff'd, 2004 U.S. App. LEXIS 18169 (6th Cir. 2004) (per curiam). See also Airline Professionals Ass'n, Teamster Local Union 1224 v. ABX Air, Inc., 400 F.3d 411 (6th Cir. 2005) (reversing District Court's finding that ABX's decision to require pilot to be cleared by an independent medical evaluator was not a minor dispute).

[2] Where parties have exchanged Section 6 notices and began renegotiation of a CBA, a dispute will not automatically be classified as "major."  Airline Professionals Ass'n, Teamster Local Union 1224 v. ABX Air, Inc., 400 F.3d 411, 415 (6th Cir. 2005).  The court must determine whether the dispute is "major" on the facts of the dispute.  Id.

Importantly, while those procedures are being exhausted, the parties are forbidden from altering the status quo or otherwise resorting to self-help. Id. at 149.

"Minor" disputes, on the other hand, are contract grievances, relating "either to the meaning or proper application of a particular provision with reference to a particular situation or omitted case." Burley, 325 U.S. at 724. Minor disputes must be addressed first through the established contractual grievance procedure and, failing that, to a local System Board of Adjustment if the employer is an air carrier. 45 U.S.C. § 184; Conrail v. Ry. Labor Execs.' Ass'n, 491 U.S. 299, 303-304, 109 S. Ct. 2477 (1989). Unions are prohibited from engaging in self-help in aid of a minor dispute. See Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R. Co., 353 U.S. 30 (1957) ("Chicago River"). If the dispute is classified as "minor," the carrier may implement a particular change in working conditions without prior negotiation, if the change is arguably justified by the terms of the parties' agreement. Conrail, 491 U.S. at 310.

The Supreme Court provided a test to determine whether a dispute is "major" or "minor" in Conrail:

> Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement. Where, in, contrast, the employer's claims are frivolous or obviously insubordinated, the dispute is major.

Id. at 307.

> We hold that if an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguable justified by the terms of the parties' agreement (i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.

Id. at 310. The difference between the two is that "[m]ajor disputes seek to create contractual rights, minor disputes to enforce them." Conrail, 491 U.S. at 302.

"The distinction between these two categories has important procedural implications." ABX I, 274 F.3d at 1028. In the major dispute context, the "RLA mandates a lengthy process of negotiation and mediation before either party may resort to self-help." Id. (citing Conrail, 491 U.S. at 302-03). During that process, the parties must maintain the "status quo" with respect to rates of pay, rules, and working conditions (see 45 U.S.C. § 152, Seventh, 45 U.S.C. § 156), and the "district courts have subject matter jurisdiction to enjoin a violation of the statute quo pending the exhaustion of the required procedural remedies." ABX II, 400 F.3d at 414 (citing Conrail, 491 U.S. at 303). Minor disputes, in contrast, are "subject to compulsory and binding arbitration" before the System Board of Adjustment created by the parties in their labor contract. ABX I, 274 F.3d at 1028; 45 U.S.C. § 184. The System Board's jurisdiction over minor disputes is exclusive, with only limited judicial review available after an award has been issued. ABX I, 274 F.3d at 1028. See also The Railway Labor Act, supra, Ch. 7.III.A., page 400 ("Neither federal not state courts may exercise jurisdiction to decide a minor dispute.") (footnotes omitted). Moreover, "there is no requirement that the parties maintain the status quo pending board resolution of the [minor] dispute." ABX I, 274 F.3d at 1028.

There is a strong presumption that a dispute between parties to an RLA agreement is minor. See, e.g., Railway Labor Executives Ass'n v. Norfolk & W. Ry. Co., 833 F.2d 700, 705 (7th Cir. 1987) ("because a major dispute can escalate into a strike, if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor"); Transportation-Communication Employees Union v. Grand Trunk W. R. Co., 679 F. Supp. 696, 699 (E.D. Mich. 1988) ("Whenever a court is in doubt as to whether a dispute is major or minor, the court must construe the dispute as a minor one."). As the Supreme Court stated in Conrail, if the employer's claim that the CBA gives it the right to make a particular change is "arguably

justified by the terms of the parties' agreement (i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the [Adjustment] Board." 491 U.S. at 310. See also CSX Transp., Inc. v. United Transp. Union, 395 F.3d 365, 368 (6th Cir. 2005) (holding that if the Company's interpretation of the contract is "arguably justified, then the issue should be resolved under the RLA's procedures for minor disputes"); United Transp. Union v. River Terminal Ry. Co., 1998 U.S. App. LEXIS 6647, *7 (6th Cir. 1998) ("If an employer's action is 'arguably justified' by the terms of the collective bargaining agreement, or its reliance on the labor contract is not 'obviously insubstantial' or 'frivolous,' the controversy is a minor dispute within the meaning of the RLA . . . ."). Thus, the carrier's burden in this regard is a "relatively light" one. Conrail, 491 U.S. at 307; Int'l Bhd. Of Teamsters v. UPS Co., 447 F.3d 491, 499 (6th Cir. 2006). See also ABX II, 400 F.3d at 414 (the carrier's burden of demonstrating that a case involves a minor dispute "is not heavy"). A court may not delve into (much less determine) which party's interpretation of the CBA is correct; once it determines that the carrier's position is "arguably justified" or "not obviously insubstantial," its role is done. Division No. 1, Detroit, Brotherhood of Locomotive Engineers v. Consolidated Rail Corporation, 844 F.2d 1218, 1221 (6th Cir. 1988) (district court erred by determining whether the company's interpretation of the labor agreements was correct rather than examining whether it was arguably justified). See also Brotherhood of Railway Carmen v. Norfolk & W. Ry., 745 F.2d 370, 376-77 (6th Cir. 1984)(where a carrier argues that its action is arguably justified under its CBA, "courts are called upon to determine only whether [that] contention is arguable, not to determine whether that contention is correct"); ABX II, 400 F.3d at 416-17 (because carrier's position was arguably justified under the CBA, "this dispute is a minor one for the purposes of the RLA, over which the district court lacked

jurisdiction"); <u>CSX Transp., Inc. v. Bhd. of Maint. of Way Emples.</u>, 327 F.3d 1309, 1322 (11th

Cir. 2003) (upon finding a minor dispute, "[the court] will not discuss whether [the company's]

interpretation is a correct one"); <u>Railway Labor Executives Ass'n v. Chesapeake W. Ry.</u>, 915

F.2d 116, 119 (4th Cir. 1990) ("A district court need not, indeed should not, assess the relative

merits of the parties' competing interpretation of the contract in order to find the dispute

'minor.'"), <u>cert. denied</u>, 499 U.S. 921 (1991); <u>Air Line Pilots Ass'n Int'l v. Eastern Air Lines</u>,

869 F.2d 1518, 1522 n.3 (D.C. Cir. 1989) ("[i]f the dispute can arguably be resolved by

interpreting or applying the terms of the contract, the fact that one party's interpretation is

implausible does not change it into a major dispute"); <u>Railway Labor Executives' Ass'n v.</u>

<u>Metro-North C. R. Co.</u>, 759 F. Supp. 1019, 1023 (S.D.N.Y. 1990) ("The court, therefore, does

not decide whether Metro-North's interpretation of the contract is correct, only that it is

'arguably justified,' as that phrase is used in <u>Conrail</u>").

    **b. <u>A TRO Is Justified.</u>**

        **i. <u>Plaintiff Has A Substantial Likelihood of Success of the Merits:</u>**
            **<u>Defendants Are Striking Over Minor Disputes</u>**

            *1. The D6 Day Issue*

The D6 Day concept was introduced into the ABX/IBT CBA by the 2003 CBA and

modified in the current to trigger the D6 Day provision when and if a crewmember had accrued

6 junior manning assignments in a calendar year. When that process was implemented,

crewmembers would identify to crew scheduling the work day to which they wanted to apply

their day off credit, and crew scheduling would respond to the crewmember to confirm that his

request had been granted. The process was very much like the positive change of control that

pilots use when the duties of the pilot-at-the-controls is passed from one pilot to the other (e.g.,

Captain: "I have the controls."  First Officer: "You have the controls.") to ensure that both pilots affirmatively know who is manipulating the controls, and who is the pilot not at the controls.  In the day off scenario, there has always been positive communications to ensure that both parties to the transaction – the crewmember and crew scheduling – know that the pilot has been removed from his work day and that crew scheduling will have to identify a pilot to fly that trip.  The process has never contemplated that crewmembers could simply send an email, or leave a voicemail, identifying their selected day off and then not show up for work.  Positive communication ensures that both parties to the transaction know what their duties and obligations are, or are not.

With one exception, ABX has not constrained when a crewmember could make that request, and when ABX would respond. IBT's position is that this process has established a binding past practice from which ABX is not – ever – allowed to deviate; the contention is that ABX violated the status quo by implementing a rule establishing when crewmembers should contact crew scheduling to request D6 days.  Plaintiffs do not, because they cannot, identify any contractual language that specifies when a crewmember can request a D6 Day, or when the Company must respond to the crewmember's request to confirm that the requested day has been granted.

Ass'n of Flight Attendants v. Mesa Air Group, Inc., 567 F.3d 1043 (9th Cir. 2009) ("AFA v. MAG") makes clear how easily a carrier can overcome the notion that the mere fact of conducting business in one way creates a binding past practice (or status quo).  In that case, AFA contended that MAG had violated the status quo when the carrier abandoned its 13 year practice of applying to the flight attendants' schedules the Federal Aviation Regulations ("FARs") that were applicable to pilots and instead using the FARs applicable to flight

attendants. The court rejected the union' reliance on <u>Detroit & Toledo Shore Line R.R. v. United Transp. Union</u>, 396 U.S. 142 (1969) ("<u>Shore Line</u>"), explaining that the interpretation AFA would give <u>Shore Line</u> would "eliminate any distinction between major and minor disputes" and ignore the Court's decision in *Conrail*, 491 U.S. 299 (1989). <u>AFA v. MAG</u>, 567 F.3d at 1049. The court also relied heavily on a decision between ABX and IBT in concluding that the parties' dispute was minor. <u>AFA v. MAG</u>, 567 F.3d at 1048.

In the ABX case – <u>Airline Prof'l Ass'n of the Int'l Bhd. of Teamsters, Local Union No. 1224 v. ABX Air, Inc.</u>, 274 F.3d 1023 (6th Cir. 2001) ("<u>ABX I</u>") – the Union contended that ABX violated the status quo when it unilaterally implemented a random search policy in an effort to mitigate a theft problem. <u>Id.</u> at 1027-28. The Union's essential contention was that the CBA did not give ABX the right to impose a search policy and had violated the status quo by doing so. <u>Id.</u> In holding that the unilateral imposition of the random search policy was a minor dispute the Sixth Circuit explained that "management retains discretion with respect to the hiring, firing, promoting, supervising, planning, and other management functions, except as limited by the collective bargaining agreement and public law." <u>Id.</u> at 1029. That was true even in the absence of an express management rights clause. <u>Id.</u> at 1027. There was nothing in the CBA that limited ABX's right to impose a random search policy just as there is nothing in the CBA that would limit ABX's ability to establish rules or polices regarding when crewmembers can ask for their D6 days, or when ABX is required to respond. Indeed, if IBT thought that was an important issue, it could have bargained to establish such limits. <u>See also</u> <u>ABX II</u>, 400 F.3d at 416-17 (contractual silence with respect to the Company's ability to require an independent medical exam resulted in a minor dispute).

It is a matter not subject to dispute that arbitral awards under the RLA are binding on the parties and become, in essence, a part of the parties' CBA.  In the *Random Search* case – <u>ABX Air, Inc. and Airline Prof'l Ass'n, Teamster Local 1224</u>, Grievance No. 254-97 (Kaplan, 1999) ("<u>ABX (Random Search)</u>")[3] – the arbitrator explained that,

> It is generally accepted arbitral authority that companies have the right to manage and operate their businesses unless the parties have altered or curtailed that right in the collective bargaining agreement. The Agreement contains no provision which denies the Company the right to unilaterally implement a random search policy. Obviously the parties could have negotiated guidelines. . . . Since the Agreement contains no such provision, there cannot be a violation of the Agreement. The Union has not limited the Company's right to unilaterally implement a search policy in the Agreement.

<u>ABX (Random Search)</u> at p. 13.  In conclusion, Arbitrator Kaplan held that, "Notwithstanding the fact that the Agreement does not contain a management's rights clause, the Board finds that the Company is free to unilaterally implement this search policy." *Id.* at p. 14.

The binding contractual teachings of the <u>ABX (Random Search)</u> case apply here.  There is no provision in the CBA that limits the Company's authority to issue policies that detail how or when Crewmembers can identify to crew scheduling the day that they select to drop as a result of a D6 Day, or when the Company can or must respond to that identification.  In order for the Court to find that the dispute over which Defendants are illegal striking is a "minor dispute" it need find only that ABX has a plausible, non-frivolous basis for its claim that it has the right to establish a policy regarding when Crewmembers inform crew scheduling of the day they wish to drop a a result of a D6 day, and when crew scheduling will respond.  That plausible and non-

_____

[3]     Attached hereto as Exhibit A.

frivolous basis is found in the absence of any contractual restriction.  Indeed, following the

rationale of the ABX (Random Search) case, ABX should prevail on that dispute in arbitration.

With respect to the Union's "past practice" argument, that fails for two reasons.  First,

whether a change to an alleged "past practice" is a violation of the status quo is, in and of itself, a

function of an arbitrator.  The Court's sole function is a case such as this is not to decide who is

right or wrong, but only if ABX's position is not frivolous or made in bad faith.

When interpreting a written labor agreement, arbitrators are tasked with ascertaining the

intent of the parties. When doing that, arbitrators often turn to past practice. Past practice alone

does not, however, tell the entire story. Arbitrators must also consider the underlying

circumstances. As Arbitrator Mittenthal noted in his seminal discussion of the usage of past

practice in interpreting written agreements: "[n]o meaningful description of a practice can be

made without mention of these circumstances."  Richard Mittenthal, Past Practice and the

Administration of Collective Bargaining Agreements, 59 Mich. L. Rev. 1017, 1019 (1960-61)

(hereinafter, "Mittenthal") (attached hereto as Exhibit B). That is because "a practice must be

carefully related to the conditions from which it arose." Id. at 1041-42. Consequently,

"[w]henever those conditions substantially change, the practice may be subject to termination."

Id. Thus, "[w]here the conditions which gave rise to a practice no longer exist, the employer is

not obliged to continue to apply the practice."  Id. at 1041. See also New York Blower Co., 95-2

ARB ¶ 5238 (Wren, 1995) ("'A past practice always depends on the continuation of the

circumstances that gave rise to the practice in the first place.'" (quoting Hill & Sinicropi,

Management Rights: A Legal and Arbitral Analysis (BNA Books, 1986)).  The same fundament

rules apply in the airline industry. See US Airways, Inc., MEC 05-04-01 (Krinsky, 2006)

(attached hereto as Exhibit C) (denying grievance, in part, because changed circumstances

justified the company's departure from past practice); *PSA Airlines, Inc.*, Griev. Nos. 26-99-02-29-05, 26-99-02-10-06, 26-99-02-11-06, 26-99-02-18-06, 26-99-02-200-07 (Paper to Web Cases), p. 12 (Ver Ploeg, 2008) (attached hereto as Exhibit D) ("The evidence in this case reveals a change in conditions – technological advances – that supported the transition from paper to web. The Company did not contravene a binding past practice when it adopted to these changed conditions.").

Delta Airlines, 103 AAR 0015 (Bloch, 1999) (Appendix A) is on point.  In that case, Delta provided cost-free parking to pilots flying out of the San Francisco Airport.  This included both pilots based at San Francisco and those commuting from San Francisco but based elsewhere.  See id.  After the San Francisco base closed, Delta continued to offer cost-free parking to commuters for eight years.  See id.  Importantly, the collective bargaining agreement covering the pilots did not require Delta to provide cost-free parking to commuters.  See id.  In 1997, Delta unilaterally discontinued its practice of providing cost-free parking for these pilots due to changed circumstances, namely a loss of available "free" parking spaces.  See id. Arbitrator Bloch ruled that Delta was justified in the actions it took.

In reaching this conclusion, Arbitrator Bloch engaged in a very thoughtful discussion of the nature of past practice and its usages by arbitrators in deciphering the intent of the parties to a collective bargaining agreement.  He noted with approval Arbitrator Mittenthal's observation that certain practices are not a result of a joint determination, but rather a choice made by management unilaterally to conduct business in a certain way that is convenient at the time.  Id. at 5.  In those instances, theorized Mittenthal, and accepted by Bloch, the practice is not binding; thus negating any need for mutual agreement prior to cessation of the practice.  Id. at 5, n.5. Arbitrator Bloch then cites as authority Mittenthal's reasoning that, even if a past practice were

binding as a result of its method of inception, if the circumstances underlying that practice

change, the practice can be subject to termination.  Id. at 6.

Applying these principles, Arbitrator Bloch determined that there was no evidence in the

record before him that the parties "jointly intended the parking benefit to extend indefinitely,

without regard to the circumstances."  Delta Airlines, 103 AAR 0015 (Bloch, 1999) (Appendix

A), at 6.  Even if the practice of paying for commuter pilots parking in San Francisco had been

the product of some sort of joint decision, moreover, changed circumstances authorized Delta to

discontinue the benefit.   In denying the grievance, Arbitrator Bloch concluded that:

> [W]ithout evidence of a mutual intent to require similar conduct in
> all circumstances in the future, a practice that is tied to existing
> conditions is subject to change.  When the conditions change, so
> may the practice.

The doctrine of changed circumstances is equally applicable here.

Indeed, the Delta decision's discussion of supposed "practices" that arise from unilateral

management decisions also show that the "practice" on which Defendants rely is not a "binding

past practice" because it arose from a unilateral management decision based on matters of

convenience, not any contractual obligation or negotiated term.

There is no binding past practice that requires ABX to allow crewmembers to freely

decide when to advice ABX of their choice of D6 Days, and even if there were, changed

circumstances justify a departure from that practice.  There is no status quo violation; Defendants

are striking over a minor dispute.

### 2. The Vacation Issue

One of the issues raised in Nowel's letter is the award of vacation to upgraded captains. ABX has complied with IBT's demands on that issue. There is no conceivable rationale that would make a strike over that issue legal.

### 3. The Day/Night Transition Issue

The third issue raised in Nowel's letter is the day/night transition issue. Nowel's letter makes a blanket allegation that unspecified flights violate the CBA's day/night transition restrictions. During the parties' meeting on November 18, Niewehous agreed that the additional of R4 assignments to the disputed flights made the contractually compliant. As with the D6 day issue, there is no provision in the CBA that expressly or implicitly limits ABX's ability to ensure the contractual compliance of a trip through the use of R4 assignments. Indeed, R4 assigments are defined in the CBA as "flight assignments." (CBA, Article 2, p. 13) Indeed, neither Nowel's letter, nor any spokesperson for Defendants during the November 18 meeting could, or even tried, to enunciate a contract-based reason why the adding R4 assignments to a bid line of time was somehow improper.

With respect to the RFD flight, the parties actually exchanged proposals that would allow a waiver of the day/night transition for that flight. Rather than respond in a meaningful way to ABX's offer that was made on November 18 that would allow that flight to continue to be flown in the same manner as had been done since that trip began, Defendants adopted an inflexible position. Consequently, ABX told Defendants that it would divest itself of that flying as soon as it was able to do so – but not later than December 1. And in the interim, there were options available to ABX – albeit very crew intensive options – that could have been adopted. Before ABX could adopt such an option, Defendants instead struck the operation.

### ii.  Plaintiff Has Shown Irreparable Injury

Regarding irreparable injury, Defendants' actions imperil ABX's revenue, operations, and customer goodwill.  The shipping public has been needlessly inconvenienced and their goods stranded.  Even if monetary damages were available for these RLA violations, there is no way to calculate the loss of customer goodwill and damage to reputation ABX will suffer. Basicomputer Corp. v. Scott, 973 F.2d 507, 512 (6th Cir. 1992) ("loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute").

### iii.  Issuance of a Preliminary Injunction Will Not Cause Substantial Harm to Others and Serves The Public Interest

Regarding public interest, the public expects that purchases and shipments be delivered in a timely fashion.  Defendants' actions undermine that expectation.  Defedants' strike has grievously harmed the public who rely on ABX for speedy, on time delivery of packages and materials.

Regarding Defendants, injunctive relief would cause them no harm whatsoever.  Their burden would simply be to obey the law and rely on the legal procedures contemplated by the RLA and the Parties' CBA.  Absent an injunction, Defendants have no incentive to stop their unlawful behavior and every incentive to encourage it.  Faced with an injunction, and the threat of sanctions for violating that injunction, Defendants can, and will, return ABX's operations to normal, ensuring that ABX can timely deliver all Christmas packages shipped on behalf of DHL.

Absent an immediate injunction, ABX, its customers, and the public will suffer immediate, irreparable harm.

### c. **The Norris-LaGuardia Act Does Not Prohibit This Injunction**

The Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101, *et seq.*, generally deprives federal courts of jurisdiction to enjoin labor disputes; however, it is well established that the RLA's more specific provisions take precedence over the more general provisions of the NLGA; therefore, federal courts have subject matter jurisdiction to enjoin a violation of the RLA's *status quo* obligations. Chi. & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570 (1970); Bhd. Of R.R. Trainmen v. Chi. River & Ind. R.R. Co., 353 U.S. 30 (1957); Bhd. Of R.R. Trainmen v. Howard, 343 U.S. 768 (1952); Delta, 238 F.3d at 1307 ("when this specific provision of the RLA is implicated and there is no other effective way to enforce the RLA, the NLGA does not prohibit a federal court from issuing an appropriate injunction").

## IV. **CONCLUSION**

For the forgoing reasons, ABX respectfully requests that this Court issue an order that prohibits Defendants and its membership from authorizing, causing, engaging in, sanctioning, or assisting in any work stoppage, strike or slowdown of ABX's operations and that requires Defendants to take all necessary means necessary to bring their unlawful strike to an end.

Respectfully submitted

*/s/ Daniel J. Buckley*
Daniel J. Buckley
Ohio Bar No. Bar No. 0003772
Vorys Sater Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45202
Telephone:     (513) 723-4002
Facsimile:     (513) 852-7865
E-mail djbuckley@vorys.com

Andrew D. McClintock *(Pro Hac Vice forthcoming)*
Patricia G. Griffith *(Pro Hac Vice forthcoming)*
Patrick H. Ouzts *(Pro Hac Vice forthcoming)*
FORD & HARRISON, LLP
271 17th Street NW, Ste. 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3830
Facsimile: (404) 888-3863
Email:  amcclintock@fordharrison.com

Dannie B. Fogleman (*Pro Hac Vice forthcoming*)
FORD & HARRISON, LLP
1300 19th Street, NW, Suite 300
Washington, DC 20036
Telephone:     (202) 719-2014
Facsimile:     (202) 719-2077

**Attorneys for Plaintiff**
**ABX Air Inc.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 22, 2016, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system.   A courtesy copy has been served on the following parties via email:

> John Robert Doll
> Doll, Jansen & Ford
> Suite 1100
> 111 West First Street
> Dayton, OH 45402-1156
> Telephone: 937-461-5310
> Fax:  937-461-7219
> Email:  jdoll@djflawfirm.com
>
> Lynne Nowel
> Airline Professionals Assoc. Teamsters Local 1224
> 2754 Old State Route 73
> Wilmington, OH 45177
> Telephone: 937-655-9585
> Fax: 937-383-0902
> Email:  lnowel@apa1224.org
>
> Ed Gleason, Esq.
> The Law Office of Edward Gleason
> 910 17th St. N.W., Suite 800
> Washington, D.C. 20006
> Telephone:  703-608-7880
> Email:  egleason@gleasonlawdc.com

*/s/  Daniel J. Buckley*
Daniel J. Buckley