# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ABX AIR, INC., | : | |
| | : | **CASE NO. 1:16-cv-1096** |
| Plaintiff, | : | |
| v. | : | **JUDGE BLACK** |
| | : | |
| INTERNATIONAL BROTHERHOOD | : | **DEFENDANTS' MEMORANDUM IN** |
| OF TEAMSTERS, AIRLINE DIVISION, | : | **OPPOSITION TO PLAINTIFF'S** |
| et al., | : | **MOTION FOR TEMPORARY** |
| | : | **RESTRAINING ORDER AND** |
| Defendants. | : | **PRELIMINARY INJUNCTION** |

---

On November 22, 2016, Plaintiff ABX Air, Inc. ("ABX" or "the Company") filed a Complaint (Doc. 1) and Motion for Temporary Restraining Order (Doc. 4) against the International Brotherhood of Teamsters ("IBT") and its affiliate, the Airline Professionals Association, Teamsters Local 1224 ("Local 1224" or "the Union"). The Plaintiff demands injunctive relief, asking this Court to "restor[e] the status quo" by enjoining the Defendants and their members from continuing a strike that began at approximately 2:00 a.m. on November 22. In addition, the Company demands broadly that the Defendants be ordered to cease any "concerted refusals to bid on open flying [a form of voluntary overtime work], or other work stoppages" and "any disruption, curtailment, or restriction of normal airline operations." Complaint, Doc. 1, at 19.

The Company's claims for injunctive relief are not well taken, as the current strike is specifically permitted by the Railway Labor Act and the case law interpreting it. ABX's actions in changing clear and unequivocal scheduling and staffing protections specifically afforded to the pilots under the parties' contract constitutes a violation of the Railway Labor Act's status quo requirements while the parties are engaged in bargaining and therefore represents a "major

dispute" under the provisions of the RLA. Contrary to the Company's views about the purposes of the strike, the Union's sole purpose in initiating the strike is to restore the status quo; Local 1224 has made clear that the strike will cease when the Company resumes compliance with the terms of the collective bargaining agreement and the status quo. The law permits a union to engage in self-help, including a strike, immediately if the employer violates the status quo during a major dispute. <u>CSX Transportation, Inc. v. Marquar</u>, 980 F.2d 359, 361, n.2 (6th Cir. 1992). That is the situation here.

ABX complains of the disruption to its operations and the impact on interstate commerce, but of course that is the very nature of a strike; the negative effects on the employer are not dispositive of whether the strike is unlawful and subject to being enjoined. To the contrary, the Union's action in this case, triggered by the Company's violation of the specific status quo requirements of the RLA, is entirely permissible under that statute and the governing case law, and this Court has no basis to issue an injunction. Furthermore, the Norris LaGuardia Act, 29 U.S.C. §§ 101, et seq., bars the Court from enjoining the Union's strike. Therefore, the Court should reject ABX's demand for injunctive relief and dismiss its Complaint.

## STATEMENT OF THE FACTS

### The Parties' Recent History

Most of the background facts relevant in this case are the same as set forth in the Union's memorandum in opposition to another recent request for injunctive relief filed by ABX Air, Case No. 1:16-CV-1039, and the Union is resubmitting here the declarations submitted by witnesses in that prior case. The Union and the Company, or their predecessors, have been parties to six collective bargaining agreements since 1983 (not 1992, as stated by ABX in its Memorandum), with

the most recent one taking effect on January 1, 2010,[1] and becoming amendable on December 31, 2014. Declaration of Richard Ziebarth in Case No. 1:16-cv-1039, attached hereto, ¶ 3 (hereinafter "First Ziebarth Decl.").

The 2009 CBA was a concessionary agreement, negotiated after ABX experienced a significant loss of business and a substantial reorganization due to the discontinuation of domestic operations by its then primary customer, DHL. The Union agreed among other things to freeze the pilots' pension, so they would no longer accrue years of service and the benefit derived would not incorporate any increase in theier annual earnings. Pay rates were cut by an average of nearly 16 percent; the crewmembers' contributions to health care premiums increased dramatically; the Company contribution to the crewmembers' 401(k) plan was eliminated and replaced with a new plan that covered only certain crewmembers; and more senior pilots lost a week of vacation. First Ziebarth Decl. ¶ 2.

ABX in 2009 also sought additional pilot productivity under Article 13, the scheduling provision. Among other things, the parties agreed to reduce the minimum days off in a bid period, to 13 days off in a 30-day period and 14 days off in a 31-day period, corresponding to a total of 17 days of work in each period. ABX also wanted to avoid having to provide premium pay (above the monthly guaranteed salary) to pilots whose schedules changed for reasons beyond the Company's immediate control. The parties reached a compromise agreement on scheduling issues, including by creating a new type of duty day called a "flex day." Flex days are "placeholder" work days listed in the lines of flying in ABX's Company's monthly bid packets. These dates do not include specific trips, but the bidding pilot is required to take an assignment on those dates if one arises. Declaration of Timothy Jewell in Case No. 1:16-cv-1039 ¶ 9 (hereinafter "Jewell Decl.").

---

[1] Although it took effect at the very start of 2010, this agreement was negotiated throughout 2009 and generally is referred to by the parties as the 2009 contract.

Even during the 2009 negotiations, though, the Union was mindful of retaining as much as possible the predictability of the pilots' schedule and protecting their days off. Throughout the parties' six successive collective bargaining agreements, crewmembers' quality of life has been a major priority for the Union in bargaining. Most if not all crewmembers are on duty in the middle of the night for several consecutive days and are away from home while on duty. Crewmembers fly both domestically and internationally, frequently changing time zones. A crewmember's time off is of utmost importance, and protecting it has always been a priority in negotiations. First Ziebarth Decl. ¶¶ 4, 5; Jewell Decl. ¶ 10.

Local 1224 also wanted to provide the pilots with greater certainty to know in advance what days off they would have each month, and the Union and the Company eventually revised substantially the emergency assignment provisions of Article 13. The current version of Article 13, Section M.2 of the contract, was changed to provide that pilots "shall only be given emergency replacement assignments on six (6) days per Calendar Year except as provided in Section M.5., of this Article." Section M.5 provides that, for each day of emergency assignment after the first six, the pilot is to be granted a day off at a later date in the current or subsequent bid month. These replacement days off are referred to as "D6" days. In addition, Section M.5 provides: "The selected Work Day(s) that are dropped due to the provisions of this Section shall be at the discretion of the Crewmember." However, these restored days off are not considered "inviolate" days. A pilot may be compensated financially in lieu of a make-up day off, but only if he or she does not have enough work days in the applicable bid period to cover it. Otherwise, "[t]he Company shall not offer and the Crewmember shall not accept pay in lieu of a getting a Day(s) Off restored." First Ziebarth Decl. ¶ 9; Jewell Decl. ¶ 13.

The parties also agreed in the 2009 contract to change certain provisions relating to open flying assignments, including permitting ABX to assign the trips to reserve pilots who would be paid at straight time instead of to regular lineholders who would be paid a premium, an important cost-savings mechanism. In partial exchange for these additional productivity and financial concessions, the Company also expressly agreed that crewmembers are "not required to bid on any open flying." Jewell Decl. ¶ 10.

The parties began negotiations to amend the 2009 CBA in late December 2013 or early January 2014. In January 2014, the Company informed the Union that it would furlough 12 pilots, all in the First Officer position, effective February 2, 2014. After reviewing the Company's staffing levels, the Union pointed out that ABX did not have enough Captains and that it was properly staffed in the First Officer position without the furloughs. After several meetings the Company and the Union entered into a Letter of Agreement ("LOA") that required ABX to upgrade five First Officers to the Captain position and provided that those Captains would be dual-qualified for both seat positions – that is, ABX could assign them to serve in the First Officer position at the Captain rate of pay. Additionally, to address the Company's concerns over an increase in the costs of vacation buy-back, the parties agreed that ABX could restrict vacation buy-back to no more than two weeks per employee during the term of the Letter of Agreement, which expired no later than December 31, 2014. First Ziebarth Decl. ¶ 6 & Ex. A thereto. Throughout this time, the Union and the Company were engaged in RLA Section 6 negotiations to amend their 2009 CBA. The parties' negotiations and resulting letter of agreement regarding crewmember furloughs and vacation buy-backs were separate and apart from the RLA Section 6 negotiations.

On March 4, 2015 the Company issued furlough and surplus notices to certain crewmembers, to be effective on April 4, 2015. The Union again reviewed the Company's staffing

and pointed out that the staffing level already was actually too low for the flying that needed to be accomplished. After additional meetings, ABX and Local 1224 entered into another Letter of Agreement dated March 17, 2015, in which the Company agreed to rescind the furlough and surplus notices. In exchange, the Union gave the Company the discretion to deny crewmembers the option to sell back vacation during the month of May 2015. As had been the case in 2014, the discussions that result in this LOA took place separate and apart from the parties' RLA Section 6 negotiations to amend the 2009 CBA. A copy of this LOA is attached to First Ziebarth Declaration as Exhibit B. First Ziebarth Decl. ¶ 7.

By April 2015, Captain Ziebarth began to receive complaints from ABX pilots about an increase in emergency assignments, also known as junior manning, to flights on their days off under Article 13, Section M of the contract. Captain Ziebarth discussed the issue with the Company and learned there had been a larger than expected number of open flights for which pilots were needed, for several reasons. Five crewmembers had resigned, an expected operational change to remove flights to three cities was delayed, the Company was continuing flights to Europe for a customer known as TNT longer than expected and another route, to GITMO, had been continued for an unspecified period of time. First Ziebarth Decl. ¶ 8. Under these rather unique circumstances, the Union took no action at that time.

In June 2015, Captain Ziebarth received a report from the Union Stewards that many crewmembers had reached or exceeded six days of emergency assignments in the calendar year already. The Union published a notice to the pilots advising them of the language in the Agreement regarding emergency assignments and D6 days. First Ziebarth Decl. ¶ 9 & Ex. C thereto.

In August 2015, Captain Ziebarth initiated discussions with ABX, urging it to recall furloughed crewmembers and reminding management of an earlier Memorandum of

Understanding, signed in April 2012, which provided that the Company would recall 14 furloughed pilots which it had failed to do. However, management refused, explaining they did not want to bring back crewmembers at the 12-year pay rate that would apply based on the furloughed employees' years of service. Instead, ABX wanted to wait until the recall rights for all furloughed crewmembers were to expire – and until those pilots thus would drop off the seniority list – in February 2016. ABX could then hire new crewmembers at much lower entry-level pay rates. Also in August 2015 Captain Ziebarth reported to the crewmembers that a substantial number of them had reached the limit of six emergency assignments, with four months remaining in the year including the busiest quarter. The pilots were advised of the provisions regarding emergency assignments. First Ziebarth Decl. ¶ 10.

While crewmembers continued to accumulate D6 days and emergency assignments continued to be made, the Company approached the Union in August 2015, again proposing relief from its obligations under the Agreement with respect to emergency assignments. The parties agreed to a temporary Voluntary Emergency Assignment program, under which crewmembers could voluntarily bid for emergency assignments and be paid the applicable premium pay but not accrue D6 days. The parties also agreed to a Voluntary Reassignment Program that would not cause crewmembers who were issued emergency reassignments while on layover to accrue D6 days. Both of these programs applied only to the fourth quarter of 2015. Finally, the Company agreed to recall six furloughed crewmembers to begin training in January 2016; these agreements were incorporated into a Memorandum of Understanding dated September 1, 2015. Once again, the discussions that led to this agreement between the parties took place separate and apart from the RLA Section 6 negotiations to amend the 2009 CBA. First Ziebarth Decl. ¶ 11 & Ex. D thereto.

On October 19, 2015, the Union notified the pilots that the Company might begin issuing advance emergency assignments and reviewed the details in the Agreement regarding advance emergency assignments. In January 2016 Captain Ziebarth reminded crewmembers to schedule any D6 days they had accumulated. The Company was continuing to emergency assign crewmembers in January 2016. First Ziebarth Decl. ¶¶ 12, 13. In February 2016, ABX agreed to recall eight additional crewmembers from furlough and hold in abeyance the removal of furloughed Crewmembers while the recall process was underway. Id. ¶ 14.

In March 2016, ABX reported that its parent company, Air Transport Services Group ("ATSG"), had entered into an agreement with Amazon to perform cargo operations in the U.S. and that ABX would be performing at least a portion of the flying. The Company also advised the Union it was going to begin the hiring process. First Ziebarth Decl. ¶ 15. During the first half of 2016, pilots continued to be emergency assigned to trips. By the end of June 2016, 59 percent of Captains and 48 percent of First Officers had reached or exceeded the six-day limit on emergency assignments. Captain Ziebarth, who is the third most senior of about 114 Captains, had reached that limit in March, less than three full months into the year. Captain Ziebarth received numerous complaints from crewmembers about the lack of time off and advised them to refrain from bidding open flying, avoid answering their phones, schedule their D6 days and take other measures to enhance their chances of having some days off. First Ziebarth Decl. ¶ 16.

Beginning in August 2016, representatives of ABX requested that Captain Ziebarth and fellow Union officer Captain Timothy Jewell meet with them to discuss granting the Company relief yet again from its obligations under the Agreement with respect to D6 days and emergency assignments. They met several times in August and September and, like the prior meetings over the last two years in which the Company sought temporary relief from its CBA obligations, the

meetings all took place separately from the parties' RLA Section 6 negotiations to amend the 2009 CBA.

The Local 1224 representatives told the Company that, while they were willing to consider once again granting ABX some relief from its obligations under the 2009 CBA regarding emergency days off and D6 restoration days off, the Union also wanted to discuss issues that were important to the crewmembers. These included job preservation and what the Union saw as the Company's longstanding tactic of playing the ABX and ATI pilot groups off one another in order to secure concessions from each.[2] The Company declined to do so and stated its view that those issues were better addressed during the parties' negotiations to amend the 2009 CBA. Nonetheless, ABX still wanted relief from the scheduling provisions of the contract. First Ziebarth Decl. ¶ 17. However, no mid-term agreement to modify the contract was reached this time.

The members of the Union Negotiating Committee decided to refrain from bidding open time or from buying back vacation and communicated that decision to the members. There was no "ban" or any other requirement that the Union members "march in lockstep" with the Union leadership on these points, as ABX alleged in its earlier complaint. First Ziebarth Decl. ¶ 21.

---

[2] ABX also claims in this case that the Union Defendants are attempting to apply leverage to induce it to merge its operations with ATI, a sister carrier owned by joint parent ATSG. See Complaint (Doc. 1) ¶¶ 32-41. The Company concedes, however, that the IBT properly petitioned the National Mediation Board to resolve whether the operational and managerial integration of ABX and ATI are such that they should be recognized as a single carrier for labor relations purposes. Id. ¶ 103. The Company's motion attempts to cast this representation dispute as a contract interpretation matter and thus to impede the NMB's investigation. It must not be allowed to do so.

"Under Section 2, Ninth of the Railway Labor Act, the National Mediation Board has exclusive jurisdiction over representation disputes." Western Airlines, Inc. v. International Bhd. of Teamsters, 480 U.S. 1301, 1302-03 (1987). This is true even if the representation dispute has arisen during the collective bargaining process because "disputes as to the effect of collective-bargaining agreements on representation in an airline merger situation are representation disputes with the exclusive jurisdiction of the National Mediation Board." Id. at 1305-06, citing Air Line Employees v. Republic Airlines, Inc., 798 F.2d 967, 968 (7th Cir. 1986; see also Independent Union of Flight Attendants v. Pan Am. World Airways, Inc., 836 F.2d 130, 131 (2nd Cir 1988)(holding that "the issue of whether the … employees may bargain as a unit or are to be represented by the larger unit is a paradigmatic representation issue subject to resolution by the National Mediation Board" and affirming its district court's holding that "a decision on [] contract issues [that] will necessarily implicate representational concerns" are matters within the NMB's exclusive jurisdiction. Independent Union of Flight Attendants v. Pan Am. World Airways, Inc., 664 F. Supp. 156, 158-59 (S.D.N.Y. 1987)).

Not only did Local 1224 not instruct pilots to refuse any assignments, on October 31, 2016, the Union provided guidance to the members about the use of D6 days. Specifically, the Union informed them of their right to take a replacement day off for each day of emergency assignment after the sixth one and told the pilots to point this out to the Crew Scheduling staff. However, the Union also advised the pilots that, if crew scheduling refused to grant any pilot a D6 day, he or she should inform the scheduler that this would result in the accrual of one more replacement day off. First Ziebarth Decl. ¶ 25 & Ex. E thereto.

On October 27, 2016, one of the Union's attorney's wrote to Robert Boja, ABX Vice-President, Flight Operations, notifying him the Company had violated its status quo obligations with respect to three issues. First, the Company was restricting the time period that it would grant Crewmembers the D6 days they selected and would only grant those days at certain times, a violation of the CBA that was clearly not arguably justified under the contract's terms. Second, the Company was refusing to make vacation periods available for crewmembers who were required to cancel their awarded vacation because of upgrade training from a First Officer to a Captain positon and stated its intention to pay the Crewmembers in lieu of their vacation days, another violation that was not arguably justified under the terms of the CBA. Third, the Company had constructed schedules that violated the clear and unambiguous restrictions relating to the transition between daytime and nighttime transitions. Mr. Boja did not respond to that letter. Declaration of Richard Ziebarth dated November 23, 2016 ¶ 5 (hereinafter "Second Ziebarth Decl.").

Instead, on October 28, 2016, Mr. Boja sent a letter to the IBT and Local 1224 accusing them of having engaged in unlawful actions by "encouraging ABX pilots not to fly open time and not to buy back vacation." That same day Mr. Boja also published a Flight Crew Letter, a formal notice to the pilots, information them that D-6 days would only be awarded to the greatest extent

possible and only when they did not create an uncovered trip. This is contrary to the express language of the CBA stating that a restored day off selected by the Crewmember "shall" be granted. The Union responded to this letter, denying the Company's allegations and stating that ABX was continuing to violate its status quo obligations. Second Ziebarth Decl. ¶ 6-7.

The Company unilaterally changed the procedures for D6 restoration days off, claiming the pilots do not have an unrestricted right to schedule those days despite the very clear contract language. The Company also cancelled the scheduled vacations of pilots who recently had upgraded to the captain position and limited their available vacation periods and changed the provisions for fatigue mitigation for pilots transitioning between daytime and nighttime flight operations. These unilateral changes violate the status quo and are not even arguably justified by the provisions of the contract. First Ziebarth Decl. ¶ 22; Declaration of Douglas Turner, attached hereto, ¶¶ 5-9 ("Turner Decl."); Second Ziebarth Decl. ¶¶ 5-19.

### The Parties' Recent, Prior Litigation

As the Court is well aware, ABX on October 31, 2016, filed a similar action to the present one, arguing that the so-called "ban" on bidding for open flying was a strike and seeking a temporary restraining order and preliminary injunction requiring the Union and the pilots to cease "any disruption, curtailment, or restriction of normal airline operations, including but not limited to strikes, concerted refusals to fly, concerted refusals to bid on open flying, or other work stoppages" and requiring the Union to encourage the pilots to cease an alleged "concerted refusal to bid on open flying." This case, while involving many of the same operative facts as the prior one, presents a much different situation legally and a different analysis – but requires the same outcome, that the request for injunctive relief be denied.

In a decision and order dated November 7, 2016, the Court denied ABX's motion for a temporary restraining order and dismissed the complaint against the Union, holding that it lacked jurisdiction over the dispute. ABX Air, Inc. v. International Bhd. of Teamsters, Case No. 1:16-CV-1038 (S.D. Ohio, Nov. 7, 2016)(Black, J.), slip op. (Doc. 16) at 12. Specifically, the Court held that the matter ABX had brought before it, disputing the Union's alleged strike activity by instructing crewmembers to avoid answering their phones, schedule their D6 days, and take other measures to enhance their chances of having some days off, was a "minor dispute" under the RLA over which it lacked jurisdiction. The Court concluded that the Union's and crewmembers' actions were more than arguably justified by the contract and recognized that ABX was improperly seeking a judicial bailout from operational and staffing fiascos that were entirely attributed to Company management. Therefore, the Court denied the Company's request for injunctive relief and dismissed its complaint. Id. at 11-12. Indeed, going further than simply concluding that the pilots' actions were arguably justified, the Court specifically recognized their explicit and unambiguous contractual rights with respect to open flying, D6 restoration days off and vacations, holding that:

> the contract gives each pilot the individual, unfettered choice of whether to bid on open flying time and provides the pilots with the right to select, without restrictions, a D6 replacement day off for every day they are emergency-assigned after the sixth time in a calendar year. Finally, although the CBA offers those who wish to work in lieu of taking their vacation time the opportunity to sell their time back to the Company, there is nothing that requires the pilots to do so. Crew members may choose to sell back their vacation time or use it, at their option. Defendants cannot have violated the RLA by engaging in action permitted by the CBA.

Id. at 11 (emphasis in original).

It is important to understand the specific "dispute" the Court dealt with in the earlier case – and what issues it did **not** address. The Court's November 7 decision involved only the dispute

over the Union's allege advice and instructions to the pilots on how to enhance their chances of having days off under the contract in the face of the Company's efforts to force them to fly on their days off. The decision did not, however, deal with the underlying dispute that triggered the Union's actions. That current dispute – which forms the basis of Local 1224's strike to restore the status quo – relates to the Company's unjustified violation and repudiation of clear, concise and mutually negotiated contractual work rules designed to afford the crewmembers' unrestricted rights concerning their selection of D6 restoration days off and use of vacation time.[3]

### The Current Situation and ABX's Triggering Status Quo Violations

Immediately after the Court dismissed ABX's earlier complaint, the Union reminded the Company that the parties' dispute regarding ABX's unjustified violations of the contract relating to D6 days, vacation and day-night transition flying were still not resolved. Specifically, in a letter dated November 7, 2016, the Union demanded written assurances that ABX would cease and desist from engaging in such unilateral and unjustified changes in terms and conditions that violating its status quo obligations under the RLA and that it will comply with its obligations under the contract. To date, however, and despite additional requests from the Union, ABX has refused to do so. Turner Decl. ¶¶ 5-9; Second Ziebarth Decl. ¶¶ 5-19.

Professing a need to better understand the issues raised by the Union, ABX requested that Local 1224 meet to discuss the dispute. The Union agreed, although the issues seemed clear, and the parties met in Washington, DC on Friday, November, 18. At the meeting, ABX stated that it would make an adequate number of weeks available to cover the vacation weeks lost by pilots who had upgraded to captain status. On the issue of the day-night transition flying rules, rather

---

[3] The Union specifically pointed out the difference between these two disputes in its brief to the Court opposing ABX's prior motion for a temporary restraining order. See Defendants' Memorandum, Case No. 1:16-CV-1039, Doc. 14, at 23, n.4.

than offering to restore the status quo by strictly following the contractual rules ABX stated simply that it could not follow those procedures with respect to one route and that it would "give up" that flying. The Local 1224 representatives reminded the Company that the Union previously had offered to provide a short-term accommodation for that route, to mitigate the pilots' risk of fatigue while still enabling ABX to keep the work. The Company thereafter offered to give up the route or to enter into an accommodation side letter with the Union based on different terms that were unacceptable to the Union. Local 1224 responded by proposing that the ABX either give up the route in question or enter into an acceptable pilot fatigue mitigation agreement covering that route, but the Company refused. ABX has not given up the flying in question, nor has it restored the status quo and resumed compliance with the contractual rules for day-night transitions. Second Ziebarth Decl. ¶¶ 10-13, 15.

Finally, with respect to the D6 restoration days dispute, ABX at the November 18 meeting recognized it had made staffing mistakes that placed the parties in their current position but stated that the current "changed" circumstances excused its unilateral change relating to the pilots' designation of D6 days off. The Union has continued to insist that ABX restore the status quo regarding D6 days and has offered to work with the company immediately thereafter to find a mutually agreeable short-term solution for its fourth-quarter staffing problems. However, ABX continues to refuse the Union's demand that it resume compliance with the contract and the binding past practice regarding D6 days. Second Ziebarth Decl. ¶ 14, 16.

Rather than make any good-faith effort to resolve the present dispute, ABX has engaged in delaying tactics in an obvious attempt to get through the busy fourth quarter of the year while ignoring the clear mandates of the parties' contract. Under these circumstances, ABX left the Union with no choice other than to engage in a strike to restore the RLA status quo violations so

flagrantly committed by ABX. The Union has specifically stated that the strike will cease immediately upon the Company's restoration of the status quo regarding the D6 days, vacation scheduling and day-night transitions. It is not and has not been an aim of this strike to exert pressure on unrelated issues at the bargaining table, including any issues over the relationship between ABX and ATI, a sister company also owned by its parent, ATSG. Second Ziebarth Decl. ¶¶ 17, 20. As discussed further below, this strike is one intended solely to protest the Company's violation of the RLA's status quo requirements and to restore that status quo; therefore, it is a "major" dispute that the Court lacks jurisdiction to enjoin.

## ARGUMENT

### This matter is outside the Court's jurisdiction.

This Court lacks jurisdiction over the Plaintiff's claims for two reasons. First, this matter involves an entirely legal strike in protest of the Company's status quo violations as part of a "major dispute" under the Railway Labor Act. Second, even if the Court determines that the present action constitutes a RLA major dispute over which it may assert jurisdiction, the Norris LaGuardia Act nevertheless would require that the Court deny the Plaintiff's request for injunctive relief.

### This matter arises out of a "major dispute" under the RLA, and the Union has the right to strike over the Company's changes in the status quo.

Unlike the situation in the most recent earlier litigation between these parties, this matter arises out of a major dispute under the Railway Labor Act. The case law provides that, where the carrier has unilaterally changed the status quo – defined as "agreements concerning rates of pay, rules, or working conditions" – the Union may strike or engage in other self-help. Because the current strike is permissible under the law, this Court is without authority to enjoin it.

## The "Minor Dispute" and "Major Dispute" Distinction

In crafting the RLA, Congress created two separate mechanisms through which efforts are to be made to resolve disputes between railroad and airline companies and employee representatives. The dispute resolution mechanism that must be used depends on whether the dispute at hand constitutes a "major" or a "minor" dispute. Although the terms "major dispute" and "minor dispute" are not used in the RLA, they figure prominently in RLA court decisions. Those terms are "drawn from the vocabulary of rail management and rail labor, as a shorthand method of describing two classes of controversy Congress had distinguished in the RLA." Consolidated Rail Corp. (Conrail) v. Railway Labor Execs' Ass'n, 491 U.S. 299, 302 (1989).

A "minor dispute" is one that "contemplates the existence of a collective agreement ('CBA')," and "relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." Elgin J. & E. Ry Co v. Burley, 325 U.S. 711, 722 (1948); Wheeling & Lake Erie Ry Co. v. Bhd. of Locomotive Eng'rs & Trainmen, 783 F. 3d 1028, 1037 (6th Cir. 2015). The Court in Burley explained that a "major dispute:"

> . . . relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

Burley, 325 U.S. at 723. Major disputes arise either when a collective bargaining agreement does not exist or when one of the parties seeks to change the terms of an existing contract. By contrast, a "minor dispute:"

> contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event, the claim is founded upon some incidents of the employment relation, or asserted one, independent of those covered by the collective agreement,

e.g., claims on account of personal injuries. In either case, the claim is to rights accrued, not merely to have new ones created for the future.

Burley, 325 U.S. at 723. The RLA mandates compulsory and binding arbitration before an adjustment board established through collective bargaining of minor disputes. 45 U.S.C. §§ 153, and 184. The adjustment board has exclusive jurisdiction over minor disputes, and federal district courts do not have jurisdiction to adjudicate them. Consolidated Rail Corp. v. Railway Labor Execs.' Ass'n, 491 U.S. 299, 303 (1989) (Conrail). "Major disputes" are predicated on the provisions set forth in RLA Section 2, Seventh, and Section 6, and relate to the formation of a CBA or efforts to change the terms of one.[4] Burley, 325 U.S. 711; Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142 (1969) ("Shore Line").

Significantly, although disputes involving violations of terms contained in a collective bargaining agreement between airline or railroad carriers and their employees' unions often are considered minor disputes, not all of them are. Under certain circumstances, a carrier that is party to a collective bargaining agreement triggers a "major dispute." For example, when a carrier unilaterally changes, or announces an intent to unilaterally change, the terms of a CBA, the dispute is deemed to be a major dispute. Conrail, 491 U.S. at 307.

---

[4] RLA Section 2, Seventh, 45 U.S.C. § 152, Seventh, states:

> no carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or through the mediation procedures established in [RLA § 6].

RLA Section 6, 45 U.S.C. § 156, states in relevant part:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules or working conditions . . . . In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by [RLA Section 5] of this title by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

In <u>Conrail</u>, the Supreme Court noted that the test to distinguish between major and minor disputes is not always easily applied and that it can lead to mischief by a party seeking the shelter of the RLA's minor dispute resolution mechanism despite having unilaterally changed or disregarded the terms of a collective bargaining agreement. The Court recognized that "there is danger in leaving the characterization of the dispute solely in the hands of one party." <u>Id.</u> at 306. The Court explained that, when a party asserts a contractual basis for taking certain actions or engaging in conduct without sincerity or on insubstantial grounds, honoring that parties' mere assertion of such a contractual basis or right would "undercut the prohibitions of § 2, Seventh, and § 6 of the Act against unilateral imposition of new contractual terms." <u>Id.</u> at 307. In that situation, the proper function of the statutory process for settling disputes is protected only if the court "substitute[s] its characterization for that of the claimant." <u>Id.</u> Accordingly, "[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." <u>Id.</u> at 310.

In adopting its test for determining whether a unilateral change to a CBA constitutes a minor or major dispute, the Court noted that the lower courts had uniformly developed variants of its test. <u>Conrail</u>, 491 U.S. at 306. Thus, the D.C. Circuit for example has explained:

> Such a unilateral change provokes a major rather than a minor dispute for an obvious reason: if the party acknowledges that the existing agreement prohibits its actions, there is no disagreement over the meaning of the contract and therefore the dispute is not one of contract interpretation. Rather, a unilateral change in the agreement look[s] to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

<u>Air Line Pilots Ass'n v. Eastern Air Lines, Inc.</u>, 869 F.2d 1518, 1523 (D.C. Cir. 1989). Other Circuit Courts similarly have explained that RLA major disputes are triggered when a carrier

unilaterally changes the terms of a collective bargaining agreement. For example, the Ninth Circuit has held:

> a controversy, although couched in terms of a disagreement as to interpretation of a contract, may under some circumstances be regarded as a major dispute. *This result may be reached if it can be said that the change being imposed by one side on the other is in nowise contemplated or arguably covered by the agreement*. The provisions of the Railway Labor Act may not be avoided merely through the device of unilateral action which the actor purposefully intends shall not become a part of the agreement.

Switchmen's Union of North Am. v. Southern Pac. Co., 398 F.2d 443, 447 (9th Cir. 1968) (emphasis added).

In the 2015 Wheeling & Lake Erie case, the Sixth Circuit applied Conrail's "arguably justified" test and found that a carrier's violation of an express term of a labor agreement mandating that minimum staffing levels of at least one union conductor per train was a major dispute. Wheeling & Lake Erie Ry Co. v. Bhd. of Locomotive Eng'rs & Trainmen, 783 F. 3d 1028, 1037 (6th Cir. 2015). The Sixth Circuit determined that the railroad's argument that the parties' collective bargaining agreement allowed it to staff trains without union conductors was "frivolous or obviously insubstantial in light of the express language of the [contract]. . . . The arguments raised and cases cited by the Railroad are unavailing in the face of this express language." Id. at 693.

Integrally related to the RLA's major dispute provisions are the statute's three status quo provisions, which require that the parties maintain, without change, the rates of pay, rules and working conditions that are "in effect prior to the time the pending dispute arose and which are involved in or related to that dispute." Shore Line, 396 U.S. at 152.[5] The Supreme Court has held

[5] The three explicit RLA status quo injunctions are set forth in RLA Section 6, 45 U.S.C. § 156, the relevant provisions of which are quoted in note 1, above. RLA Section 5, First, 45 U.S.C. § 155, First, which provides that for the 30-day "cooling off" period following a notice from the National Mediation Board that its mediation efforts have failed or until an Emergency Board is created under RLA Section 10, "no change shall be made in the rates of

that the RLA's status quo provisions, "together with [RLA] Section 2, First, form an integrated, harmonious scheme for preserving the status quo for the beginning of the major dispute through the final 30-day 'cooling-off' period." Id.[6] Their purpose is to "prevent the union from striking and management from doing anything that would justify a strike" until the parties have exhausted the negotiation and mediation procedures, or reached agreement in the meantime, if that is possible." Id. at 148.

Under the RLA, major disputes are resolved through a very different procedure than that used for minor disputes. RLA carriers and representatives trigger the major dispute procedures when one or both of them serve an RLA "Section 6 notice" on the other party advising of their desire to modify an agreement governing rates of pay, rules or working conditions. Those procedures consist of "elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation," Shore Line, 396 U.S. at 148-49; see 45 U.S.C. § 156.

If either a carrier or a labor representative violates the RLA's status quo obligations, the other (injured) party may take decisive action to remedy that violation. For one thing, the injured party may file suit in federal court and seek an injunction preserving the status quo while the parties remain subject to the RLA's negotiation and mediation procedures. Shore Line, 396 U.S. at 148-49; Wheeling & Lake Erie, 789 F.3d at 690; Association of Flight Attendants v. Mesa Air Group, 567 F.3d 1043, 1047 (9th Cir. 2009); Eastern Air Lines, Inc., 869 F.2d at 1520. See 45 U.S.C. § 156.

---

pay, rules or working conditions or established practices in effect prior to the time the dispute arose." RLA Section 10, 45 U.S.C. § 160, provides that after the creation of a Presidential Emergency Board, "no change, except by agreement, shall be made in the conditions out of which such dispute arose.

[6] RLA Section 2, First, 45 U.S.C. § 152, First, states that "[i]t shall be the duty of all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."

Most significantly for the present case, the party harmed by a change in the status quo may also engage in self-help in order to compel the offending party to restore that status quo. For example, if a carrier triggers a status quo violation by unilaterally and without any arguable justification changing or disregarding the terms of a collective bargaining agreement, a Union can lawfully engage in a strike to compel the carrier to restore the status quo. Such status quo strikes are lawful – even if the collective bargaining agreement has a no-strike clause. The federal courts have long recognized the legality of such status quo strikes and held that they lack the legal authority to stop the strike except in very narrow circumstances involving violence and property damage. In upholding status quo strikes the Supreme Court explained that, because a carrier's status quo violation that triggers such a strike is at odds with the RLA, it can "hardly be expected that the union would sit idly by as the [carrier] rushed to accomplish the very result the union was seeking to prohibit by agreement." Shore Line, 396 U.S. at 154.

In circumstances where a carrier triggers a status quo violation, therefore, the Court held that "the union cannot be expected to hold back its own economic weapons, including the strike." Id.; see also Atlanta & West Point R.R. Co. v. United Transp. Union, 439 F.2d 73, 80 (5th Cir. 1971)("'the union had the right to strike; that right continues until the Act is complied with by the Carrier     . . .'"), quoting Seafarers Int'l Union v. Galveston Wharves, 400 F.2d 320, 333 (5th Cir. 1968). See also National Airlines, Inc. v. Int'l Ass'n. of Machinists & Aerospace Workers, 416 F.2d 998, 1003, n.3 (5th Cir. 1969) (noting that RLA status quo strike is terminable after carrier complies with the statute).

As the Sixth Circuit has noted: "It has been held that if the [carrier] violates the status quo during a major dispute by altering the pay, rules or working conditions, the union may strike immediately before exhausting the conciliation steps."  CSX Transportation, Inc. v. Marquar,

980 F.2d 359, 361, n.2 (6th Cir. 1992), *citing* <u>Detroit & T.S.L.R. v. United Transportation Union</u>, 396 U.S. 142, 154 (1969).

In this case, ABX Air approached the Union in 2016 – as it has done before, during the current, ongoing negotiations but separately from them – and sought mid-term contractual relief from its scheduling obligations and staffing shortfalls. The Union repeatedly had accommodated the Company and agreed to modified rules and exceptions to the contract's requirements, even though it considered that the staffing difficulties were brought about by the Company itself. <u>See</u> First Ziebarth Decl. ¶¶ 6, 7, 11, 18 & 26 and Exs. A, B & D thereto. However, by mid- 2016 the Local concluded that it had obtained little if any consideration from ABX for making these temporary modifications to the contract and to the Company's obligations to the crewmembers.

Therefore, this time the Union and pilots refused ABX's request for yet another short-term agreement to provide the Company mid-term contractual relief and the pilots have exercised their contractual right not to bid for open time flying. Many also have declined to sell back their vacation time and work instead – perhaps because they already are required to work on their days off. The Union and a weary pilot group advised ABX that they were not willing to provide additional interim relief to management under the existing contract without consideration for it. In response, the Company unilaterally changed the pilots' working conditions by refusing to allow the pilots to select D6 restoration days off without restriction or interference, cancelling the scheduled vacations of pilots who recently have upgraded to the captain position and limiting their available vacation periods and changing the provisions for fatigue mitigation for pilots transitioning between daytime and nighttime flight operations. By these actions, ABX management unilaterally imposed conditions that management had failed to

win at the bargaining table and without even arguable justification under the terms of the collective bargaining agreement, in violation of the status quo.

The Employer's unilateral changes in the terms and conditions of employment under the collective bargaining agreement triggered a "major dispute" under <u>Conrail</u>. Therefore, the Union's strike to protest the change in the status quo is lawful, and this Court has no authority to enjoin it.

## <u>The Norris-LaGuardia Act Bars the Relief Plaintiff Seeks.</u>

Since the enactment of the Norris-LaGuardia Act ("NLGA"), federal courts have been precluded from issuing injunctions in cases "involving or growing out of …labor dispute[s]." 29 U.S.C. § 101. In removing the federal courts from the business of intervening in labor disputes, Congress resorted to the "extraordinary remedy" of "jurisdiction-stripping to prevent the federal courts from using their powers to weaken unions and cripple striking workers." <u>Burlington Northern Santa Fe Ry. Co. v. International Bhd. of Teamsters Local 174</u>, 203 F.3d 703, 709 (9th Cir. 2000). Because Plaintiff cannot meet its burden under several provisions of the NLGA, this Court has no basis to grant the requested relief.

## <u>Plaintiff is required to offer evidence at an evidentiary hearing sufficient to support its requested relief before that relief may be considered under NLGA.</u>

Under the statute and controlling case law, if this Court does consider Plaintiff's motion for injunctive relief, it may not do so without first scheduling an evidentiary hearing which permits both sides to present in-person testimony and evidence and to cross-examine witnesses.

The NLGA's requirement for an evidentiary hearing is jurisdictional:

No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and

except after findings of fact by the court, to the effect- (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof; (b) That substantial and irreparable injury to complainant's property will follow; (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief; (d) That complainant has no adequate remedy at law; and (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107.

The Sixth Circuit has made clear that there "is no such uncertainty in this circuit as to whether a district court must observe the procedural requirements of § 7 before issuing an injunction in a case involving or growing out of a labor dispute. This court has long held that when the allegations of a complaint seeking an injunction are denied by the defendant, the defendant is entitled to a hearing on controverted facts as well as upon questions of law." UAW v. LaSalle Machine Tool, Inc., 696 F.2d 452, 457 (6th Cir. 1982). It is well settled that, where there exists a controversy over the facts under the NLGA, a hearing must be held prior to granting an injunction. UAW v. Lester Eng'g, Co., 718 F.2d 818 (6th Cir. 1983). At such a hearing, the plaintiff is "required to offer evidence in support of the allegations set forth in the complaint" and the defendant offered the opportunity for testimony and evidence in opposition. Detroit & T.S.L.R. Co. v. Brotherhood of Locomotive Firemen & Enginemen, 357 F.2d 152, 153-54 (6th Cir. 1966).

In addition, Norris-La-Guardia contains in Section 8 what amounts to a "clean-hands" provision. It provides that no restraining order or injunctive relief shall be granted to "any complainant who has failed to comply with any obligation imposed by law which is involved in

the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. A party that has not made every reasonable effort under the statute prior to seeking injunctive relief has not complied with the NLGA's clean hands requirement. <u>Brotherhood of RR Trainmen v. Toledo P. & W. RR</u>, 321 U.S. 50, 60 (1944). Where an employer does not make every reasonable effort to settle the dispute under the RLA with its employees and union, a District Court's granting of an injunction is inappropriate. <u>Aircraft Service Int'l. v. International Bhd. of Teamsters</u>, 779 F.3d 1069, 1077-79 (9th Cir. 2015).

In situations similar to the present case, courts have refused to grant injunctive relief to an employer to seeking to prohibit a union from striking in response to the carrier's resort to self-help. For example, in *Butte, A & P. Ry. Co. v. Bhd. of Locomotive Firemen & Enginemen*, the Ninth Circuit Court of Appeals denied the carrier's request for injunctive relieve when the carrier abandoned mediation and unilaterally amended the parties' contract. 268 F.2d 54 (9th Cir. 1959).

The case at bar presents circumstances similar to those which were considered in *Butte*. In *Butte*, the railroad-carrier opened a new switching yard and desired that the some of the work in the new yard be done by a third party instead of its railroad employees. With this idea in mind, the carrier, pursuant to the requirements of the RLA, served the union with a Section 6 notice to open negotiations concerning its intention to amend the existing agreement to permit the loading of ore to be performed by its main line crew instead of the union yard crew. *Id. at 55.*

The union declined to agree to the amendment and sought mediation services from the National Mediation Board. *Id. at 56.* Shortly after negotiations commenced, the railway informed the union that it was withdrawing its Section 6 notice, did not believe that the "status quo" provisions of the RLA applied and would commence the loading of cars as it had intended. *Id.*

In response, the union issued a modified proposal which would have permitted the loading of cars as the railway had proposed in exchange for increased compensation for union employees who were excluded from this work. Id.at 57.  When the Railway rejected the union's counter and stated that it would unilaterally impose its previous proposal, the Union voted to strike. *Id. at 57*. The employer-carrier filed suit in District Court to enjoin the union from striking, and the District Court granted the carrier's petition for injunctive relief. *Id*. On appeal, however, the Ninth Circuit Court of Appeals vacated the injunction finding that the carrier had failed to exercise reasonable efforts to resolve the dispute as required by the NLGA and was therefore barred from obtaining injunctive relief. *See id. at 60*.  In vacating the District court's grant of injunctive relief to the employer-carrier, the Ninth Circuit noted, "Injunctive relief may be utilized by either party to vindicate the processes of the Railway Labor Act.  But here appellant does not seek an injunction to compel arbitration of Railway Labor Act procedures.  Rather it wants to enjoin employees from resorting to self-help after appellant itself (through Anaconda) abandoned those procedures." *Id. at 60*.

As in Butte, the Plaintiff comes into this Court without "clean hands" and should not be granted the injunctive relief it is requesting.

### **Plaintiff has failed to meet the requirements of Section 7 of the NLGA.**

Because ABX has failed to strictly comply with the requirements of the NLGA, this Court cannot issue the requested injunction. Section 7 of the Act provides:

> "No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter."

29 U.S.C. § 101.

NLGA Section 7 sets forth jurisdictional elements that, if not met, preclude a District Court from issuing an injunction. UAW v. LaSalle Machine Tool, Inc., 696 F.2d 452, 458 (6th Cir. 1982). Plaintiff does not, and cannot, meet the jurisdictional requirements of Section 7.

ABX does not allege and certainly cannot prove that any unlawful act has been threatened or committed. The pilots' choice not to bid voluntary open time, sell back vacation time, and utilizing their contractual rights to replacement days off after they are emergency-assigned are simply not unlawful acts. See ABX Air (Open Flying I), 266 F.3d at 398. A strike to maintain the status quo in terms and conditions of employment is also not unlawful.

Moreover, Plaintiff cannot demonstrate substantial and irreparable injury to its property based on Plaintiff's own actions in altering the status quo. Although ABX is quick to claim that the Union's status quo strike will result in the loss of thousands of dollars of revenue, this argument invokes a weighing of equities which was already contemplated and addressed by the authors of the RLA. Indeed, Sections 102 and 103 of the NLGA emphasize that it "shall be contrary to the public policy of the United States" to interfere with the rights of union members and their selected representatives to negotiate and enforce the terms and conditions of their employment. 29 U.S.C. §§ 102, 103. If Plaintiff secures an injunction, it will have obtained, through judicial and extra-statutory means, the right to mid-term relief from both its contractual obligations to adhere to the provisions negotiated therein and its statutory obligations to observe and maintain the status quo pursuant to Section 2, First of the RLA. Conversely, the Union and its pilots will be deprived of a significant right for which they bargained. The Union exchanged economic concessions for those protections, which are narrow limitations on the assignment of overtime and compensation for unused vacation time. Allowing ABX to run roughshod over the jointly negotiated provisions of the collective bargaining agreement will undermine the Union's

role and legitimacy as the representative of the pilots and eviscerate the statutory framework for negotiation and conciliation of disputes established by the RLA.

The Company also cannot demonstrate that the public officers charged with protecting its property cannot or will not furnish adequate protection. <u>Amalgamated Local 813, Allied Indus. Workers v. Diebold, Inc.</u>, 605 F. Supp. 32, 34 (N.D. Ohio 1984). The court in <u>Diebold</u> specifically noted that this finding is required in a case involving a strike. It is clear that the Plaintiff does not meet even the minimum standards for granting relief provided in Section 7(e).

### Plaintiff has not complied with the necessary bond requirement of Section 7.

Section 7 of the NLGA requires that the extraordinary remedy of injunctive relief, specifically including temporary injunctions, be conditioned on the posting of a bond by the party for whose benefit the injunction is issued:

> No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107.[7] The language of NLGA on this point is mandatory. First, Section 1 of the NLGA declares that a court may not issue a temporary or permanent injunction "in any case involving or growing out of a labor dispute, except in **strict conformity** with the provisions of this chapter." 29 U.S.C. § 101 (emphasis supplied). This is followed by, *inter alia*, Sections 7

---

[7] Similarly, Federal Rule of Procedure 65(c) states that no preliminary injunction should issue "except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongly enjoined or restrained." Rule 65 does not modify any federal statute "relating to temporary restraining orders or preliminary injunctions in actions affecting employer and employee" – that is, the NLGA. Fed. R. Civ. P. 65(e); <u>Association of Machinists & Aerospace Workers v. Eastern Air Lines, Inc.</u>, 925 F.2d 6, 9 (1st Cir. 1991). The bond requirement in NLGA Section 7 differs from Rule 65(c) in two critical respects: (1) Rule 65(c) bonds are discretionary with the court, while NLGA Section 7 bonds are mandatory; and (2) a Section 7 bond must be sufficient to include the enjoined party's attorney's fees and expenses of defense, not just "costs and damages." <u>Id.</u>

and 9, which "impose a number of substantive and procedural conditions on the availability of injunctive relief." Camping Constr. Co. v. District Council of Iron Workers, 915 F.2d 1333, 1341 (9th Cir. 1990). As shown, Section 7 mandates injunction bonds in labor disputes, declaring unequivocally that no temporary injunction "shall be issued except on condition that complainant shall first file" a bond covering the actual and anticipated costs as described.

As the statutory language indicates, a court cannot issue injunctive relief absent compliance with these requirements. See, e.g., Michigan Am. Fed. of State, County and Mun. Employees Council 25, Local 1640 v. Matrix Human Servs., 589 F.3d 851, 855 n.2 (6th Cir. 2009) (NLGA's bond requirement "is part of the jurisdictional precondition for injunctions in federal courts arising out of labor disputes"); Dist. 29, United Mine Workers of Am. v. New Beckley Mining Co., 895 F.2d 942, 947 (4th Cir. 1990) ("The district court can issue no injunction without adhering to the strict procedural requirements of § 7."); In re Dist. No. 1 - Pac. Coast Dist. Marine Eng'rs Beneficial Ass 'n, 723 F.2d 70, 76-77 (D.C. Cir. 1983) ("Strict adherence to the Act's procedures is not a mere matter of form: A district court has no jurisdiction under the [Norris-LaGuardia Act] to issue a labor injunction without adhering to the explicit terms of the Act.") (emphasis in original); United Tel. Workers v. Western Union Corp., 771 F.2d 699, 704 (3rd Cir. 1985). See also, 48B Am. Jur. 2d Labor and Labor Relations, § 2776 ("Before a temporary restraining order or temporary injunction may be issued in accordance with the Norris-LaGuardia Act, a complainant must first file a bond. The absence of this bond precludes a federal court from granting a preliminary injunction.") (emphasis added).

The Union requests that, if the Court grants injunctive relief against it, the Court require that Plaintiff's bond be sufficient to cover all of the Union's potential damages, including attorneys' fees, should its position that the injunction should not have issued ultimately prevail.

This would include not only the attorneys' fees and expenses associated with the injunction itself (and any appeal therefrom), but also the fees and expenses the Union will incur in defending against Plaintiff's efforts to obtain permanent injunctive relief.  See 29 U.S.C. § 107 (amount of the bond should be sufficient to compensate party for expenses, costs and damages associated with the order granting temporary injunctive relief "or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court") (emphasis added).

The Union estimates that, if an injunction is granted in this case, its fees and expenses in pursuing an appeal of the order would be approximately $125,000, which would include seeking to stay the order, drafting initial and reply briefs to the Sixth Circuit, and argument before the appellate court. The Union also estimates t its fees and expenses in defending against the Plaintiff's efforts to obtain permanent injunctive relief in this matter would be approximately $350,000, which would include discovery, pre-trial motions, and trial. Therefore, if the Court issues an injunction against it, the Union requests that the amount of the bond be set at $475,000.00.

### The relief ABX seeks is overbroad and would enjoin conduct well outside of the specific acts at issue in this case.

Even if the Plaintiff had complied with the NLGA's requirements, its requested relief is overboard.  Section 9 of the NLGA provides the following:

> No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of findings of fact made and filed by the court in the record of the case prior to the issuance of such restraining order or injunction; and every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court as provided in this chapter.

29 U.S.C. § 109.

In the present case, the injunctive relief ABX seeks does not comply with NLGA Section 9 and Federal Rule of Civil Procedure 65(d). The Union requests that the Court deny ABX's request for injunctive relief entirely or, to the extent it determines that any such relief is warranted, that it encompass only the matter that specific matter that gave rise to that relief in the first place, namely, the Union' work stoppage to enforce the status quo items relating to the specific contractual mandates violated by ABX relating to D6 restoration days off, vacations and day-night transition rules.

> ABX seeks an injunctive order with the following terms:
>
> IBT, Local 1224, and Local 1224's officers, members, and representatives and all persons acting by, in concert with, through, or under them and each of them, or by and through their orders, and all others acting or participating with them from calling for, permitting, instigating, authorizing, encouraging, participating in, approving of, commencing, or continuing, <u>in connection with the parties' Section 6 negotiations or any other major or minor dispute contemplated by the Railway Labor Act, any disruption, curtailment, or restriction of normal airline operations, including but not limited to strikes, concerted refusals to fly, concerted refusals to bid on open flying, or other work stoppages, and all acts in furtherance or in support thereof</u>.

(Emphasis added.) On its face, the injunctive relief requested by ABX is far too broad. ABX seeks an order prohibiting not only the Union's strike to enforce ABX's RLA status quo obligations, but also prohibiting conduct that the Court has just held is entirely lawful, including concerted refusals by pilots not to bid for open flying. Through its overbroad request, ABX also seeks to enjoin lawful, future status quo strikes by the Union. The Company further seeks prospective injunctive relief prohibiting "all acts in furtherance" of such lawful activities as concerted refusals by pilots to bid for open flying, as well as any and all future status quo strikes that may be triggered by ABX's misconduct.

The all-encompassing relief sought by Plaintiff represents its continuing, improper attempt to enmesh the Court in a dispute over which it has no jurisdiction for the purpose of

relieving it of its contractual and statutory obligations. ABX's requested relief does not conform to the strict mandates and of NLGA Section 9 and Rule 65(d) of Civil Procedure, both of which are intended to guard against the harassment by and threats of contempt by litigants, including employers engaged in disputes with labor organizations. See Pittsburgh-Des Moines Steel Co. v. United Steelworkers of America, 633 F.2d 302 (3d Cir. 1980); International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967) (stating Rule 65(d) of the Federal Rules of Civil Procedure expresses a policy against vague decrees that can transform the contempt power from a "potent weapon" into a "deadly one"). Therefore, this request should be denied.

### Granting ABX's requested relief would restrict the Union's First Amendment-protected speech and create an unlawful prior restraint upon such speech.

The proscriptions sought by AXB against otherwise lawful non-work-stoppage conduct and expression impermissibly infringe upon the Union's First Amendment rights. Just as Congress wisely instructed federal courts to refrain from interference in labor disputes, the Supreme Court also wisely has instructed the lower courts not to punish conduct and communications that are protected by the First Amendment. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907-915 (1982) (nonviolent elements of petitioners' boycott activities, including speeches and picketing, are protected by the First Amendment); Thornhill v. Alabama, 310 U.S. 88, 102 (1940) (peaceful picketing urging a consumer boycott is constitutionally protected activity); ProtectMarriage.com v. Bowen, 559 F. Supp. 2d 1197, 1218 (E.D. Cal. 2009) (public boycott is constitutionally protected; "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values.").

The Union has a federally protected right to engage in non-work stoppage conduct and communications relating to disputes it now has or may in the future have with ABX. Such

conduct and communications are all intended to advertise the existence of a labor dispute with ABX and to elicit support for their cause. The injunctive relief sought by ABX impermissibly interferes with the Union's constitutionally-protected rights to engage in non-work stoppage conduct such as informational picketing, handbilling, bannering, organizing consumer boycotts, communicating with the press, and petitioning state and federal regulatory agencies. Such conduct and communications are constitutionally protected and cannot lawfully be enjoined by the Court.

If granted, ABX's requested injunctive relief would similarly constitute an impermissible prior restraint under the First Amendment. A "prior restraint on expression . . . comes with a 'heavy presumption' against its constitutional validity." Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971), *quoting* Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175, 181 (1968). Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." Nebraska Press Ann's v. Stuart, 427 U.S. 539, 559 (1976). When a prior restraint takes the form of a court-issued injunction, the risk of infringing on First Amendment protected speech increases. Madsen v. Women's Health Ctr., 512 U.S. 753, 764 (1994). In the present case, as noted above, ABX seeks a broad order prospectively enjoining future conduct, including conduct the Court has already held is lawful. In so doing, the order does not differentiate between work-stoppage and non-work stoppage related conduct and expression. As such, the order impermissibly infringes upon the Union's First Amendment rights. Overstreet v. United Bhd. of Carpenters, 409 F.3d 1199, 1128 (9th Cir. 2005).

Finally, because of the vagueness of the standard that ABX requests the Court impose to measure the Union's compliance with any injunctive order, namely, "disruption, curtailment or restriction of normal airline operations," the relief sought by ABX also violates the Noerr-

*Pennington* doctrine, which safeguards the First Amendment right to "petition the government for a redress of grievances" by immunizing citizens from the liability that may attend the exercise of that right. See <u>Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S.127, 136-39 (1961); <u>United Mineworkers v. Pennington</u>, 381 U.S. 657, 669 (1965). The doctrine originated from <u>Noerr</u>, where the Supreme Court extended First Amendment protection to lobbying efforts for anti-competitive legislation, explaining that "mere attempts to influence the passage or enforcement of laws" cannot comprise a violation of antitrust law. <u>Noerr</u>, 365 U.S. at 135.

The Court subsequently expanded <u>Noerr</u>-<u>Pennington</u> immunity to alleged labor law violations, <u>BE & K Constr. Co. v. N.L.R.B.</u>, 536 U.S. 516, 526 (2002), and to "the approach of citizens or groups of them to administrative agencies . . . and to courts, the third branch of Government." <u>California Motor Trucking Transport Co. v. Trucking Unlimited</u>, 404 U.S. 508, 510 (1972). The Union and the ABX pilots periodically petition Congress and various federal regulatory agencies to publicize their disputes with ABX and to obtain support for their position in those disputes. Although such activity clearly is protected by the First Amendment, one can imagine counsel's future arguments that such interferes with ABX's "normal operations." By denying the requested relief, this Court may foreclose that possibility altogether.

**CONCLUSION**

For the foregoing reasons, the Defendants, International Brotherhood of Teamsters and Local 1224, respectfully request that the Plaintiff ABX Air's motion for temporary restraining order and preliminary injunction be denied and that this matter be dismissed as outside the Court's

jurisdiction. However, should the Court determine not to dismiss this action for lack of subject-matter jurisdiction at this time, it must conduct a full evidentiary hearing in open court and afford both parties the opportunity to present sworn testimony and to cross-examine each other's witnesses, in accordance with Section 7 of the Norris LaGuardia Act.

Respectfully submitted,

**DOLL, JANSEN & FORD**

*/s/ Julie C. Ford*
John R. Doll (0020529) – Trial Attorney
Julie C. Ford (0040896) – Co-Counsel
111 W. First St., Suite 1100
Dayton, OH 45402-1156
(937) 461-5310; (937) 461-7219 (fax)
jdoll@djflawfirm.com
jford@djflawfirm.com

*/s/ Edward M. Gleason, Jr.*
Edward M. Gleason, Jr.
*Pro Hac Vice Admission Pending*
Law Office of Edward Gleason, PLLC
910 17th Street, NW, Suite 800
Washington, DC 20006
202-800-0099
egleason@gleasonlawdc.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of November, 2016, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Daniel J. Buckley
Vorys, Sater, Seymour & Pease LLP
301 E. Fourth St., Suite 3500
Great American Tower
Cincinnati, OH  45202
djbuckley@vorys.com

Andrew D. McClintock
Patricia G. Griffith
Ford & Harrison, LLP
271 17th Street NW, Ste. 1900
Atlanta, GA  30363
amcclintock@fordharrison.com
pgriffith@fordharrison.com

Dannie B. Fogleman
Ford & Harrison, LLP
1300 19th Street NW, Ste. 300
Washington, DC  20036
dfogleman@fordharrison.com

_____
*Julie C. Ford*