## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

ABX AIR, INC.,

      **Plaintiff,**

v.

INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, AIRLINE DIVISION,
et al.,

      **Defendants.**

:    CASE NO. 1:16-CV-1039

:    JUDGE BLACK

## DECLARATION OF RICHARD ZIEBARTH

The following declaration is made pursuant to 28 U.S.C. § 1746:

I, RICHARD ZIEBARTH, declare that I am over the age of 18 years; I have personal knowledge of the following facts; and I can testify to these facts if called upon to do so.

1.    I am employed by ABX Air, Inc., (ABX" or "the Company") as a Boeing 767 Captain and have been employed by ABX or one of its predecessor companies since June 13, 1977. I am currently number three on the seniority list of approximately 114 active ABX employees in the 767 Captain position.

2.    I served as the President of the Airline Professionals Association, Teamsters Local Union No. 1224, ("Local 1224" or "the Union") for approximately five years, until December 31, 1999. I currently am the Chair of the Union's Executive Council ("ExCo") for the unit of crewmembers employed at ABX.

3.    The Union (or its predecessor) and the Company have been parties to six collective bargaining agreements beginning in 1983; the most recent one took effect on January 1, 2010, and became amendable on December 31, 2014. I was a member of the Union's Negotiating Committee, actively participating in the negotiations, for the 1992 Agreement with ABX and was a

1

participant on a part-time basis on the Union's Negotiating Committee for the negotiations of the 1997 and 2010 Agreements. I have led the Union's Negotiating Committee in the current negotiations since bargaining with the Company that began in December 2013 or early January 2014.

4.     Throughout all of the negotiations in which I was involved, the crewmembers' quality of life has been was a major priority for the Union in bargaining. Most if not all crewmembers are on duty in the middle of the night for several consecutive days and are away from home while on duty. Crewmembers fly both domestically and internationally, frequently changing time zones. A crewmember's time off is of utmost importance, and protecting it has always been a priority in negotiations. The current CBA provides for a minimum of 13 days off in a 30-day bid period and 14 days off in a 31-day bid period.

5.     The 2010 CBA was a concessionary agreement, negotiated after ABX experienced a significant loss of business and a substantial reorganization due to the discontinuation of domestic operations by its then primary customer, DHL. The Union agreed among other things to freeze the pilots' pension, so they would no longer accrue years of service and the benefit derived would not incorporate any increase in a crewmember's earnings. Pay rates were cut on average by nearly 16 percent; the crewmembers' contributions to health care premiums increased dramatically; the Company contribution to the crewmembers' 401(k) plan was eliminated and replaced with a new plan that covered only certain crewmembers; and more senior pilots lost a week of vacation. Most significantly for this case, the number of days off was reduced from 15 days off in a bid period to the present 13 and 14 days off, in a thirty and thirty one day bid period respectively. Protecting days off took on even greater significance during the term of the current Agreement.

6.  In January 2014, once Railway Labor Act ("RLA") Section 6 negotiations to amend the 2009 CBA had begun, the Company informed the Union that it would furlough 12 pilots, all in the First Officer position, effective February 2, 2014. After reviewing the Company's staffing levels, the Union pointed out that ABX did not have enough Captains and that it was properly staffed in the First Officer position without the furloughs. After several meetings the Company and the Union entered into a Letter of Agreement ("LOA") that required the Company to upgrade five First Officers to the Captain position and provided that those Captains would be dual-qualified for both seat positions – that is, ABX could assign them to serve in the First Officer position at the Captain rate of pay. Additionally, to address the Company's concerns over an increase in the costs of vacation buy-back, the parties agreed that ABX could restrict vacation buy-back to no more than two weeks per employee during the term of the Letter of Agreement, which expired no later than December 31, 2014. A copy of the LOA, which is dated January 24, 2014, is attached as Exhibit A. The discussions and resulting LOA between the parties took place separate and apart from the parties' RLA Section 6 negotiations to amend the 2009 CBA.

7.  On March 4, 2015 the Company issued furlough and surplus notices to certain crewmembers, to be effective on April 4, 2015. The Union again reviewed the Company's staffing and pointed out that the staffing level already was actually low for the flying that needed to be accomplished. After additional meetings, ABX and Local 1224 entered into another Letter Agreement dated March 17, 2015, in which the Company agreed to rescind the furlough and surplus notices. In exchange, the Union gave the Company the discretion to deny crewmembers the option of buying back vacation during the month of May 2015. A copy of this LOA is attached as Exhibit B. As had been the case in 2014, the discussions and resulting LOA between the parties took place separate and apart from the parties' RLA Section 6 negotiations to amend the 2009 CBA.

8.     By April 2015, I began to receive complaints from ABX pilots about an increase in emergency assignments, also known as junior manning, to flights on their days off under Article 13, Section M of the contract. I discussed the issue with the Company and learned that there had been a larger than expected number of open flights for which pilots were needed, for several reasons. Five crewmembers had resigned, an expected operational change to remove flights to three cities was delayed, the Company was continuing flights to Europe for a customer known as TNT longer than expected and another route, to GITMO, had been continued for an unspecified period of time. Given these somewhat unique circumstances, the Union did not take any action at the time.

9.     In June 2015, I received a report from the Union Stewards that many crewmembers had reached or exceeded six days of emergency assignments in the calendar year already. Under Article 13, Section M.2 of the contract, which was added in the 2009 negotiations, pilots "shall only be given emergency replacement assignments on six (6) days per Calendar Year except as provided in Section M.5., of this Article." Section M.5 provides that, for each day of emergency assignment after the first six, the pilot is to be granted a day off at a later date in that bid month or the following one. These are referred to as "D6" days. In addition, Section M.5 provides: "The selected Work Day(s) that are dropped due to the provisions of this Section shall be at the discretion of the Crewmember." However, these restored days off are not considered "inviolate" days. A pilot may be compensated financially in lieu of a make-up day off, but only if he or she does not have enough work days in the applicable bid period to cover it. Otherwise, "[t]he Company shall not offer and the Crewmember shall not accept pay in lieu of a getting a Day(s) Off restored." The Union published a notice to the pilots advising them of the language in the Agreement regarding emergency assignments and D6 days; a copy is attached as Exhibit C.

10.     In August 2015, I initiated discussions with ABX, urging it to recall furloughed crewmembers and reminding management of an earlier Memorandum of Understanding, signed in April 2012, which provided that the Company would recall 14 furloughed pilots. However, management refused to do so, explaining they did not want to bring back crewmembers at the 12-year pay rate that would apply based on the furloughed employees' years of service. Instead, ABX wanted to wait until the recall rights for all furloughed crewmembers were to expire – so those pilots would drop off the seniority list – in February 2016. ABX could then hire new crewmembers at entry-level rates. That month I also reported to the crewmembers that a substantial number of them had reached the limit of six emergency assignments, with four months remaining in the year including the busiest quarter. The pilots were advised of the provisions regarding emergency assignments.

11.     While crewmembers continued to accumulate D6 days and emergency assignments continued to be made, the Company approached the Union in August 2015, again proposing relief from its obligations under the Agreement with respect to emergency assignments. The parties agreed to a temporary Voluntary Emergency Assignment program, under which crewmembers could voluntarily bid for emergency assignments and be paid the applicable premium pay but not accrue D6 days. The parties also agreed to a Voluntary Reassignment Program that would not cause crewmembers who were issued emergency reassignments while on layover to accrue D6 days. Both of these programs applied only to the fourth quarter of 2015. Finally, the Company agreed to recall six furloughed crewmembers to begin training in January, 2016. The Memorandum of Understanding dated September 1, 2015, that incorporates these agreements is attached as Exhibit D. As had been the case in 2014 and earlier in 2015 the discussions and resulting agreement

between the parties took place separate and apart from the parties' RLA Section 6 negotiations to amend the 2009 CBA.

12. On October 19, 2015, the Union notified the pilots that the Company might begin issuing advance emergency assignments and reviewed the details in the Agreement regarding advance emergency assignments.

13. In January 2016 I reminded crewmembers to schedule any D6 days they had accumulated. The Company was continuing to emergency assign crewmembers in January 2016.

14. In February 2016, ABX agreed to recall eight additional crewmembers from furlough and hold in abeyance the removal of furloughed Crewmembers while the recall process was underway.

15. In March 2016, ABX reported that its parent company, Air Transport Services Group ("ATSG"), had entered into an agreement with Amazon to perform cargo operations in the U.S. and that ABX would be performing at least a portion of the flying. The Company also advised the Union it was going to begin the hiring process.

16. During the first half of 2016, pilots continued to be emergency assigned to trips. By the end of June approximately 59 percent of Captains and approximately 48 percent of First Officers had reached or exceeded the six day limit of emergency assignments. I had reached that limit in March, less than three full months into the year and even though the assignments are made in reverse seniority order and I am the third most senior Captain, out of about 114 Captains. I received numerous complaints from crewmembers about the lack of time off and advised them to refrain from bidding open flying, avoid answering their phones, schedule their D6 days and take other measures to enhance their chances of having some days off.

17.     Beginning in August 2016, representatives of ABX requested that fellow Union officer Tim Jewell and I meet with them to discuss granting the Company relief yet again from its obligations under the Agreement with respect to D6 days and emergency assignments. We met several times in August and September and, like our prior meetings over the last two years in which the Company sought temporary relief from its 2009 CBA obligations, these meeting all took place separate and apart from the parties' RLA Section 6 negotiations to amend the 2009 CBA. During our meetings, we told the Company that while we were willing to consider once again granting the Company relief from its obligations under the 2009 CBA regarding emergency days off and D6 restoration days off, we wanted to discuss issues that were important to the Crewmembers, namely job preservation and the Company's longstanding tactic of playing the ABX and ATI pilot groups off of one another in order to secure concessions from them. The Company declined to do so and stated its view that those issues were better addressed during the parties' negotiations to amend the 2009 CBA. However, ABX still wanted relief from the scheduling problems. Shortly thereafter, the Company unilaterally changed the pilots' working conditions by refusing to allow them to select D 6 restoration days off without restriction or interference from the Company, thereby unilaterally imposing a condition that it failed to obtain at the bargaining table during the 2009 CBA negotiations.

18.     Based on information obtained by Union stewards from the Company and which I have reviewed, the Company's pilot staffing levels during the one-year period covering September, 2015 through September, 2016 shows that that the Company has short-staffed itself for a very long time. ABX had 185 bidding crewmembers at the end of September 2015, but that number decreased to 178 by the end of January 2016. That was the lowest number of crewmembers on the active seniority list since August 2015, when ABX had 175 bidding pilots

but less business. That decrease contributed greatly to the Company's need for mid-term contractual relief from its scheduling obligations under the current CBA in order to cover its 2015 fourth-quarter peak season flying.

19.     As noted above, after the remaining furloughed ABX pilots lost their recall rights in February 2016, the Company did begin hiring pilots. By the end of April 2016, however, the number of bidding pilots on the active seniority list was only 188, an increase of only 13 since the beginning of the year. ABX increased its available crewmember headcount only modestly, despite the fact that it had already entered into a contract with Amazon in March 2016 that required it to significantly increase its aircraft operations beginning later in 2016 and to expand its fleet of wide-body aircraft by the end of 2017. All of this has been taking place during a period in which there is a greatly publicized and steadily increasing world-wide shortage of qualified pilots.

20.     Despite increasing its business and flight schedules over the last several months as it brought more aircraft on line to meet its obligations to its customers, ABX increased its total pilot number to only 198 by the end of September. Additionally, during the one-year period covering September, 2015 through September, 2016, the Company's data also shows that it underestimated the actual number of flying hours by a significant amount each and every month. By consistently and significantly underestimating the number of flying hours required to be flown each month, the Company underestimated the number of pilots needed to fly. This mistake compounded each month and contributed to the Company's staffing shortfall. In sum, therefore, the large disparity between the minimal rise in staffing levels and the enormous increase in the necessary flying hours to fulfill the schedule the Company needs to meet its additional service obligations to its customers. Put simply, ABX did not adequately staff its

operations to meet its additional service obligations to its customers. It is a classic case of driving faster than one's headlights on a dark night.

21.    Neither Local 1224 nor any of the individual officers have been actively encouraging the pilots to refrain from bidding open time or from buying back vacation, since June 2016 or otherwise, as the Company alleges in this case. The members of the Union negotiating committee have decided not to do so and have communicated that to the members. However, there is no "ban" or any other requirement that the Union members "march in lockstep" with the Union leadership on these points.

22.    The pilots are, frankly, exhausted from the amount of additional flying time ABX has been requiring in 2016. The Union's records indicate that, from January 1 to October 25, 2016, the Company has emergency assigned the approximately 200 bargaining-unit pilots on 7,094 days. This level of extra work, particularly when it can be assigned on relatively short notice, is not only tiring but greatly disrupts the personal and family lives of the crewmembers, who fly domestically and internationally and who generally do not live near one of the Company's two domiciles for purposes of reporting to work. It is understandable to me that the pilots are not only weary but frustrated that the Company is forcing them to work this overtime, rather than making reasonable staffing plans. Therefore, it also seems reasonable that they are deciding not to voluntarily bid for extra work or to sell back their vacation. (It is also ironic that ABX is demanding that pilots sell back vacation time now, since in the past the Company complained about the cost of vacation buy-backs and negotiated limits on that practice.)

23.    In recent weeks, the Company has unilaterally changed the application of D6 restoration days off, claiming that the pilots do not have an unrestricted right to schedule those days despite the clear contract language giving them the discretion to do so, and refusing to allow them to

select their replacement days off. The Company also is not making sufficient vacation weeks available for the crewmembers, refusing to schedule their vacation time and attempting to force them to sell it back. Both of these unilateral changes, in the Union's opinion, violate the status quo.

24.    I did not threaten a strike or work stoppage of any kind on October 28, 2016, or at any time this year. I did not say, as the Company alleges, that the Union "will shut them down" on November 1, 2016. The Union does not intend to strike at this time, and it certainly did not "set a strike date of November 2, 2016," as ABX alleges.

25.    Not only did Local 1224 not instruct pilots not to refuse any assignments, on October 31, 2016 the Union provided guidance to the members about the use of D6 days. Specifically, the Union informed them of the rights to take a replacement day off for each day of emergency assignment after the sixth one and told the pilots to point this out to the Crew Scheduling staff. However, the Union also advised the pilots that, if a crew scheduling refused to grant any pilot a D6 day, he or she should inform the scheduler that this would result in the accrual of one more replacement day off. A copy of that guidance e-mail is attached as Exhibit E.

26.    I did state to the Company's Vice President of Operations, Robert Boja, that ABX's current staffing levels and its procedures were going to result in "a meltdown," since it was not adequately staffed and since the emergency assignment and D6 days were snowballing. However, the snowballing effect had begun to occur very early in the year, long before any crewmembers began to decline bidding for open flying. The Company's current scheduling problems, including the increased cost and the lack of available crewmembers, are entirely of its own making.

Richard Ziebarth

_November 2, 2016_