UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ABX AIR, INC., | : | Case No. 1:16-cv-1096 |
| Plaintiff, | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| INTERNATIONAL BROTHERHOOD | : | |
| OF TEAMSTERS, AIRLINE | : | |
| DIVISION, *et al.*, | : | |
| Defendants. | : | |

**ORDER GRANTING PLAINTIFF'S MOTION
FOR A TEMPORARY RESTRAINING ORDER (Doc. 4)**

This civil action is before the Court on Plaintiff's motion for a temporary

restraining order (Doc. 4) and the parties' responsive memoranda (Docs. 7, 8).  Pursuant

to the requirement of the Norris-LaGuardia Act (the "NLGA"), the Court held an

evidentiary hearing on November 23, 2016 at 3:30 p.m.  Plaintiff presented its affiant,

Robert Nicholas Boja, in person under oath who affirmed the truth of his affidavit and the

verified complaint and was subject to the crucible of cross-examination.  Defendants

presented two witnesses, W. Richard Ziebarth and Douglas Turner, who also presented

evidence and were subject to cross-examination.

Plaintiff moves for a TRO to enjoin Defendants International Brotherhood of

Teamsters ("IBT") and Airline Professionals Association of the International

Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224") (collectively,

"Defendants") from engaging in unlawful self-help.  Specifically, Defendants

orchestrated a work stoppage that started at approximately 2:30 a.m. on November 22,

2016 and is ongoing.  This work stoppage has interrupted interstate commerce by causing

the cancellation of at least 26 ABX flights and the stranding at least 1.25 million pounds of cargo for one ABX customer, and even more for other customers.

Plaintiff alleges that Defendants are required to resolve all "minor disputes" through arbitration rather than self-help.  Defendants maintain that the terms and conditions of the pilots' employment are contrary to the status quo and therefore it is not unlawful to strike in order to restore the status quo.

## I.    BACKGROUND FACTS

Plaintiff and Defendants, or their predecessors, have been parties to six collective bargaining agreements since 1983 (except in 1992), with the most recent agreement taking effect on January 1, 2010, and becoming amendable on December 31, 2014.  (Case No. 1:16cv1039, Doc. 14-1 at ¶ 3).[1]

The 2009 CBA was a concessionary agreement, negotiated after ABX experienced a significant loss of business and a substantial reorganization due to the discontinuation of domestic operations by its then primary customer, DHL.  (Case No. 1:16cv1039, Doc. 14-7 at ¶ 9).  The parties reached a compromise agreement on scheduling issues, including creating a new type of duty day called a "flex day."  (*Id.*)  Flex days are

---

[1] Plaintiff ABX is a "carrier by air" as defined by the RLA.  (Case No. 1:16cv1039, Doc. 1 at ¶ 18).  ABX transports time-sensitive materials nationwide.  Its two primary customers are DHL and AFS, a subsidiary of Amazon.  (*Id.* at ¶¶ 13, 20).

Defendant IBT is a local organization headquartered in Washington, D.C.  (Case No. 1:16cv1039, Doc. 1 at ¶ 25).  IBT is the collective bargaining representative of the ABX pilots under the RLA.  Local 1224 is a labor organization headquartered in Wilmington, Ohio.  (*Id.* at ¶ 26).  Local 1224 is a chartered affiliate of IBT, and, as such, provides labor representation services to pilots represented by IBT employees at numerous airlines throughout the United States.  (*Id.*)

"placeholder" work days. (*Id*.) These dates do not include specific trips, but the bidding pilot is required to take an assignment on those dates if one arises. (*Id*.)

During the 2009 negotiations, the Union was mindful of retaining, to the extent possible, the predictability of the pilots' schedule and protecting their days off. Most (if not all) crewmembers are on duty in the middle of the night for several consecutive days and are away from home while on duty. Crewmembers fly both domestically and internationally, frequently changing time zones. Accordingly, a crewmember's time off is of utmost importance, and protecting it has always been a priority in negotiations. (Case No. 1:16cv1039, Doc. 14-1 at ¶¶ 4-5; Doc. 14-7 at ¶ 10).

Additionally, the current version of Article 13, Section M.2 of the contract, was changed to provide that pilots "shall only be given emergency replacement assignments on six (6) days per Calendar Year except as provided in Section M.5., of this Article." Section M.5 provides that, for each day of emergency assignment after the first six, the pilot is to be granted a day off at a later date in the current or subsequent bid month. These replacement days off are referred to as "D6" days. In addition, Section M.5 provides: "The selected Work Day(s) that are dropped due to the provisions of this Section shall be at the discretion of the Crewmember." However, these restored days off are not considered "inviolate" days. A pilot may be compensated financially in lieu of a make-up day off, but only if he or she does not have enough work days in the applicable bid period to cover it. Otherwise, "[t]he Company shall not offer and the Crewmember shall not accept pay in lieu of a getting a Day(s) Off restored." (Case No. 1:16cv1039, Doc. 14-1 at ¶ 9; Doc. 14-7 at ¶ 13).

3

The parties also agreed in the 2009 contract to change certain provisions relating to open flying assignments, including permitting ABX to assign the trips to reserve pilots who would be paid at straight time instead of to regular lineholders who would be paid a premium, an important cost-savings mechanism.  In partial exchange for these additional productivity and financial concessions, Plaintiff also expressly agreed that crewmembers are "not required to bid on any open flying."  (Case No. 1:16cv1039, Doc. 14-7 at ¶ 10).

The parties began negotiations to amend the 2009 CBA in late December 2013 or early January 2014.  In January 2014, Plaintiff informed the Union that Plaintiff would be furloughing 12 pilots, all in the First Officer position, effective February 2, 2014.  After reviewing Plaintiff's staffing levels, the Union pointed out that ABX did not have enough Captains and that ABX was properly staffed in the First Officer position without the furloughs.  After several meetings, the parties entered into a Letter of Agreement ("LOA") that required ABX to upgrade five First Officers to Captain positions and provided that those Captains would be dual-qualified for both seat positions — that is, ABX could assign them to serve in the First Officer position at the Captain rate of pay. (Case No. 1:16cv1039, Doc. 14-1 at ¶ 6, Ex. A).

On March 4, 2015, Plaintiff issued furlough and surplus notices to certain crewmembers, to be effective on April 4, 2015.  The Union again reviewed Plaintiff's staffing and pointed out that the staffing level already was actually too low for the flying that needed to be accomplished.  After additional meetings, ABX and Local 1224 entered into another LOA dated March 17, 2015, in which Plaintiff agreed to rescind the furlough and surplus notices.  In exchange, the Union gave Plaintiff the discretion to deny

4

crewmembers the option to sell back vacation during the month of May 2015.  (Case No.
1:16cv1039, Doc. 14-1 at ¶ 7).

By April 2015, Captain Ziebarth began to receive complaints from ABX pilots
about an increase in emergency assignments to flights on their days off.[2]  In June 2015,
Captain Ziebarth received a report that many crewmembers had reached or exceeded six
days of emergency assignments in the calendar year already.  (Case No. 1:16cv1039,
Doc. 14-1 at ¶ 9, Ex. C).

During the first half of 2016, pilots continued to be emergency assigned to trips.
By the end of June 2016, 59 percent of Captains and 48 percent of First Officers had
reached or exceeded the six-day limit on emergency assignments.  Captain Ziebarth
received numerous complaints from crewmembers about the lack of time off and advised
them to refrain from bidding open flying, avoid answering their phones, schedule their
D6 days, and take other measures to enhance their chances of having some days off.
(Case No. 1:16cv1039, Doc. 14-1 at ¶ 16).

On October 31, 3016, Plaintiff filed a motion for a TRO, claiming that unless the
Court enjoined the concerted refusal by ABX's crewmembers to bid on voluntary
overtime and to buy back vacations, ABX would experience service failures.  (Case No.
1:16cv1039, Doc. 2).  Furthermore, Plaintiff argued that the pilots had threatened to
strike.  (*Id.*)  Ultimately, this Court determined that: (1) relying on Defendants
representation that they were not going to strike, the Court could not enjoin the same; and

---

[2] Captain Ziebarth has been employed by ABX or one of its predecessor companies since June
13, 1977.  (Case No. 1:16cv1039, Doc. 14-1 at ¶ 1).  Ziebarth is the Chair of the Union's
Executive Council for the unit of crewmembers employed at ABX.  (*Id.* at ¶ 2).

(2) it could not enjoin the pilots from engaging in action permitted by the CBA. (Doc. 16). Specifically, the Court found that it lacked jurisdiction over Plaintiff's claims because the matter represented a "minor dispute" under the RLA that must be addressed through dispute resolution procedures before the System Board of Arbitration. (*Id.*)

Despite additional negotiations following the Court's Order, the parties have been unable to reach a resolution, and, on November 22, 2016, at approximately 2:30 a.m., the pilots went on strike.

Plaintiff moves the Court for a Temporary Restraining Order because the RLA bars Defendants from striking over minor disputes. Conversely, Defendants argue that they are permitted to strike in order to maintain the status quo.

## II.   STANDARD OF REVIEW

"The Sixth Circuit has explained that 'the purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.'" *Reid v. Hood*, No. 1:10 CV 2842, 2011 U.S. Dist. LEXIS 7631, at *2 (N.D. Ohio Jan. 26, 2011) (citing *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996)). "The standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo." *Id.* (citing *Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)).

Plaintiff bears the heavy burden of demonstrating his entitlement to a TRO. An "injunction is an extraordinary remedy which should be granted only if the movant

carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't,* 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to grant injunctive relief, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction. *Id.* These four considerations are factors to be balanced, not prerequisites that must be met. *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

## III.    ANALYSIS

### A.   Likelihood of Success on the Merits

#### *1. The RLA*

The Railway Labor Act provides:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152.  The RLA imposes "upon the parties an obligation to make every reasonable effort to negotiate a settlement and to refrain from altering the status quo by

resorting to self-help while the Act's remedies [are] being exhausted." *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 149 (1969).

The RLA distinguishes between two categories of labor disputes: "disputes concerning the making of collective agreements," known as major disputes, and "disputes over grievances," known as minor disputes. *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 722 (1945). Major disputes give federal courts jurisdiction; minor disputes must be submitted to binding arbitration. (*Id.*)

A major dispute is one that arises "where a CBA does not exist or where one of the parties seeks to change the terms of an existing CBA. The issue in a major dispute 'is not whether an existing agreement controls the controversy'; instead, the focus is on the 'acquisition of rights of the future, not [the] assertion of rights claimed to have vested in the past.'" *Burley*, 325 U.S. at 723. When parties are engaged in a major dispute under the RLA, they must maintain the status quo until they exhaust the major dispute process. *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 302-03 (1989). If either side unilaterally alters the status quo, "[a] court may issue an injunction to put a stop to that party's illegal self-help and to restore the status-quo, and it may do so even without the traditional showing of irreparable injury to either party." *United Air Lines, Inc. v. Int'l Ass'n of Machinist Aerospace Workers, AFL-CIO*, 243 F.3d 349, 361 (7th Cir. 2001).

A "minor dispute" is a dispute arising out of the interpretation of an existing CBA. *Airline Prof'ls Ass'n, Teamster Local Union 1224, ABX Air, Inc*, 400 F.3d 411, 414 (6th Cir. 2005). As the Supreme Court has held:

8

> Minor disputes grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions. Minor disputes involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation[,]… develop from the interpretation and/or application of the contracts between the labor unions and carriers…[and] pertain[] only to disputes invoking contract-based rights.

*Hawaiian Airlines v. Norris*, 512 U.S. 246, 252-54 (1994). Significantly, "the RLA precludes the federal courts from granting relief on minor disputes that have not first been brought through the RLA arbitration process." *Emswiler v. CSX Transp.*, 691 F.3d 782, 789 (6th Cir. 2012).[3] Moreover, "[t]here is a strong presumption that a dispute between parties to an RLA agreement is minor." *Airline Prof'ls Ass'n v. ABX Air, Inc.*, No. 1:07cv820, 2007 U.S. Dist. LEXIS 95124 (S.D. Ohio Dec. 14, 2007). And the party attempting to establish that the dispute is minor has a "relatively light burden." *Conrail v. Ry. Labor Executives' Ass'n*, 291 U.S. 299, 307 (1989).

This is a minor dispute because it arises out of thew interpretation of an existing CBA, and Plaintiff has not changed the terms of the CBA. *See infra* Section A. 2, 3, 4.

The RLA authorizes injunctive relief to prevent an illegal strike. *Bhd. of R.R. Trainmen v. Chicago River & Indiana R.R. Co.*, 353 U.S. 30, 40 (1957). In *Chicago River*, the Supreme Court found that the parties were engaged in a minor dispute and held that the union was bound by the FLA's "unequivocal" language not to strike, and instead

---

[3] *See, e.g., Airline Prof'ls Ass'n of the Int'l Bhd. of Teamsters, Local Union No. 1224 v. ABX Air, Inc.*, 274 F.3d 1023, 1028 (6th Cir. 2001) (minor disputes are "subject to compulsory and binding arbitration[.]" ); *Kaschak v. Consol. Rail Corp.*, 707 F.2d 902, 904-05 (6th Cir. 1983) (minor disputes are outside a federal court's jurisdiction and are subject to dismissal pursuant to Rule 12(b)(1)).

had to use the arbitration procedures made mandatory by the Act. *Id.* at 32. The Supreme Court then determined that "the federal courts can compel compliance with the provisions of the Act to the extent of enjoining a union from striking to defeat the jurisdiction of the Adjustment Board." *Id.* at 39. "[T]his implied right of action created in *Chicago River* exists under the RLA although the statute is silent as to any such right." *CSX Transp. Inc. v. Marquar*, 980 F.2d 359, 363 (6th Cir. 1992).

### 2. D6 Day Dispute

Defendants argue that Plaintiff disrupted the status quo when Plaintiff required pilots to report D6 days five days in advance. However, a November 21, 2016 memorandum to crewmembers states that crewmembers must give "*between* five days and 24 hours" notice. (Doc. 1-4) (emphasis added). Accordingly, crewmembers are not required to give five days notice.

Defendants also argue that Plaintiff is bound by its past practice regarding the communication of D6 Days and that it has violated the status quo by implementing a new rule deviating from its past practice. However, there is no contractual language in the CBA that specifies the timeframe during which a crewmember must request a D6 Day or when the Company must respond. For example, in *Airline Prof'l Ass'n of the Int'l Bhd. of Teamsters, Local Union No. 1224 v. ABX Air*, Inc., 274 F.3d 1023 (6th Cir. 2001) ("ABX I"), the Union contended that ABX violated the status quo when it unilaterally implemented a random search policy in an effort to mitigate a theft problem. *Id.* at 1027-28. The Union contended that the CBA did not give ABX the right to impose a search policy and had violated the status quo by doing so. *Id.* In holding that the unilateral

imposition of the random search policy was a minor dispute, the Sixth Circuit explained that "management retains discretion with respect to the hiring, firing, promoting, supervising, planning, and other management functions, except as limited by the collective bargaining agreement and public law." *Id.* at 1029. There was nothing in the CBA that limited ABX's right to impose a random search policy just as there is nothing in the CBA that would limit ABX's ability to establish rules or polices regarding when crewmembers can ask for their D6 days, or when ABX is required to respond.

Whether a change to an alleged "past practice" is a violation of the status quo is a function of the arbitrator. When interpreting a written labor agreement, arbitrators are tasked with ascertaining the intent of the parties. Moreover, "a practice must be carefully related to the conditions from which it arose." Richard Mittenthal, *Past Practice and the Administration of Collective Bargaining Agreements*, 59 Mich. L. Rev. 1017, 1041-42 (1960-61). Consequently, "[w]henever those conditions substantially change, the practice may be subject to termination." *Id.* For example, in *Delta Airlines*, 103 AAR 0015 (Block, 1999), Delta provided cost-free parking to pilots flying out of the San Francisco Airport. *Id.* After the San Francisco base closed, Delta continued to offer cost-free parking for eight years. *Id.* The CBA did not require Delta to provide cost-free parking. Subsequently, Delta unilaterally discontinued the practice due to changed circumstances, namely a loss of available "free" parking spaces. *Id.* The arbitrator ruled that Delta was justified in the actions that it took because there was no evidence that the parties "jointly intended the parking benefit to extent indefinitely, without regard to circumstances." *Id.* The past-practice was not binding because is arose from a unilateral

management decision based on matters of convenience, not any contractual obligation or negotiated term.

Similarly, here, there is no binding past practice that requires ABX to allow crewmembers to freely decide when to advise ABX of their choice of D6 Days, and even if there were, an arbitrator may find that changed circumstances justify a departure from that practice.

### 2. Day-Night Transition Flying Rules

Next, Defendants allege that the Rockford flight violates the CBA's day/night transition restrictions. However, Plaintiff expressly stated that it will terminate the Rockford trip. (Doc. 1-3 at PageID 308).

### 3. Vacation Time

Finally, Defendants allege that Plaintiff improperly rescinded pilots' vacation time. However, Plaintiff expressly requested the names of the pilots whose vacation time had been rescinded and is in the process of restoring that vacation time.

Accordingly, Defendants have failed to evidence that there is a violation of the status quo.

### B. Irreparable Injury

"[L]oss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." _Basicomputer Corp. v. Scott_, 973 F.2d 507, 512 (6th Cir. 1992). As of day one of the strike, Defendants actions caused the cancellation of at least 26 flights for at least four customers carrying approximately 1.25 million pounds of cargo and has damaged goodwill with its

customers. (Doc. 1 at ¶ 68, 70). The Court finds that there is no way to calculate the loss of customer goodwill and damage to reputation and that the Plaintiff will suffer irreparable harm as a result.

### C. Harm to Others and the Public Interest

The public expects that purchases and shipments will be delivered in a timely fashion. Accordingly, there is a significant public interest in enjoining Defendants' strike. Absent an injunction, ABX, its customers, and the public will suffer immediate, irreparable harm. Imagine Christmas without Amazon!

There is no evidence that Plaintiff is violating the status quo pursuant to the terms of the CBA. Accordingly, there is no evidence that Defendants will be injured by enjoining the strike.

### D. Bond

Pursuant to Fed. R. Civ. P. 65(c) "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite the mandatory language of the rule, the Court often has discretion to determine an appropriate amount of, or even waive, bond. *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir. 1982).

However, Section 7 of the NLGA <u>requires</u> the posting of a bond:

> No temporary restraining order or temporary injunction shall be
> issued except on condition that complainant shall first file an
> undertaking with adequate security in an amount to be fixed by the
> court sufficient to recompense those enjoined for any loss,
> expense, or damage caused by the improvident or erroneous issuance

13

> of such order or injunction, including all reasonable costs (together with a reasonable attorney's fees) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107.  The bond requirement in NLGA Section 7 differs from Rule 65(c) in two critical respects: (1) Rule 65(c) bonds are discretionary with the court, while NLGA Section 7 bonds are mandatory; and (2) a Section 7 bond must be sufficient to include the enjoined party's attorney's fees and expenses of defense, not just "costs and damages." *Id.*

Defendants estimate that if an injunction is granted its fees and expenses in pursuing an appeal of the order would be approximately $125,000 and fees and expenses in defending against Plaintiff's efforts to obtain permanent injunctive relief would be approximately $350,000, so Defendants request the amount of bond be set at $475,000. Accordingly, the Court imposes a bond in the amount of $475,000.

## IV.   CONCLUSION

For these reasons, Plaintiff's motion for a temporary restraining order (Doc. 4) is **GRANTED**.  Specifically, Defendants and its members are prohibited from authorizing, causing, engaging in, sanctioning, or assisting in any work stoppage or strike of ABX's operations.  The strike shall cease immediately upon the docketing of this Order and the Plaintiff's docketing of a supersedeas bond or cash in the amount of $475,000.

**IT IS SO ORDERED**.

Date:  11/23/16                                  *s/ Timothy S. Black*
                                                Timothy S. Black
                                                United States District Judge